263 F.Supp.2d 413 (2003)
UNITED STATES of America
v.
Anthony WASHINGTON
No. 3:02CR146 (JBA).
United States District Court, D. Connecticut.
May 15, 2003.
*416 Roger H. Sigal, Federal Public Defender's Office, New Haven, CT, Sarah A. Chambers, Natick, MA, for Defendant.
John H. Durham, John A. Danaher, III, James I. Glasser, Keith A. King, U.S. Attorney's Office, New Haven, CT, for U.S.

Ruling on Defendant's Amended Motion for New Trial [Doc. # 68]
ARTERTON, District Judge.
Defendant Anthony Washington ("Washington") moves under Fed.R.Crim.P. 33 to vacate his conviction after jury trial for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) and correspondingly for a new trial. As set forth in more detail below, Washington's motion [Doc. #68] is GRANTED. The Court's ruling is based alternatively on the late disclosure of the previous conviction of Joseph McNeill ("McNeill"), the Government's *417 key witness, for making a false report of a crime to law enforcement, and prosecutorial misconduct in the cross-examination of the defense's key witness, summation, and rebuttal summation. Both alternative holdings rely on the context of a short trial in which Washington's conviction rested on a single piece of evidence.

I. Factual Background

A. Introduction and Context
Washington was convicted on October 9, 2002, after a trial that consisted of roughly three and one quarter days of evidence, one half day of closing arguments and jury charge, and less than a full day of jury deliberations. The conviction under 18 U.S.C. § 922(g) required the Government to prove beyond a reasonable doubt that Washington had been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm on December 5, 2001 at 37-39 Maple Street in New Haven, Connecticut, and that the possession was in or affecting interstate commerce. The parties stipulated to the prior felony,[1] and Washington does not base his motion on the interstate commerce element. Rather, Washington focuses his attack on the evidence of possession and its trial context.
The 37-39 Maple Street residence at which the events of December 5, 2001, took place, was a three family home owned by Danielle Soradi ("Soradi"), who lived on the first floor with her boyfriend McNeill and her two daughters. Ebony Moore ("Moore"), Washington's girlfriend, was the second floor tenant and Washington resided with her and the couple's two children. The third floor was occupied by another tenant, Susie Jenkins, her daughter and, temporarily, her brother Vincent Jenkins.

B. Incidents Prior to December 5, 2001
Prior to trial (and reaffirmed in colloquy prior to the commencement of evidence), the Court had precluded from the Government's case-in-chief any evidence related to Washington's participation in a feud between rival gangs, activities of Washington or anyone with him on the evening of November 22, 2001, and a shooting on the same evening in which one individual sustained a gun shot wound in a residential neighborhood following altercations at the Kangaroo Club and a pizza shop. According to police interrogation transcripts, the encounter in the residential neighborhood erupted in a gun fight, and the individual was shot while fleeing the scene. The individual and a friend were able to flag down a vehicle in which Washington and another individual were riding and thereby obtain transportation to Yale New Haven Hospital. At the hospital, the injured individual was treated for a gunshot wound and police searched the car and found a firearm in the backseat. Because one of the individuals whom Washington and his friend had driven to the hospital confessed to ownership of the firearm, Washington was not prosecuted for any crime related to the weapon in the car.
The Government was permitted to elicit evidence of two acts of vandalism to Moore's automobile while parked at 39 Maple St. in the days leading up to December 5, 2001, to demonstrate Washington's *418 motive to possess a gun (but not to demonstrate that such vandalism was the result of an ongoing feud between rival gangs). The windshield of Moore's automobile had been smashed on November 24, and, on December 3, gun shots were fired at the automobile's rear passenger door and elsewhere, leaving a bullet hole in the door and three shell casings near the residence.

C. Evidence of Washington's Possession of a Firearm
The evidence at trial revealed that, on December 5, 2001 at approximately 4:30pm, Washington and McNeill had some type of encounter either on the porch outside 37-39 Maple Street or in the doorway of 39 Maple Street. At the time, neither Moore nor Soradi was home and Washington was under the influence of some behavior-altering substance. Apparently, the sound of the encounter prompted Vincent and Susie Jenkins to come down from their third floor apartment to investigate. The Jenkinses and McNeill then assisted Washington back up to Moore's second floor apartment from which McNeill made a 911 call. During the call, McNeill made statements directly implicating Washington's possession of a firearm, including
... He had a gun in his hand. I took the gun out of his hand. I... I have the gun downstairs.
...
He wants his gun.
Police officers subsequently recovered a gun from a table just inside the door of Soradi's and McNeill's first floor apartment.
Vincent Jenkins testified that he saw Washington downstairs in a condition he described as "out of it," and that, after he and his sister aided McNeill in helping Washington to his second floor apartment, they returned to their third floor apartment. Vincent Jenkins testified that he did not see any gun in Washington's possession or otherwise, and that he never reported to any police officer that he had seen a gun or that he had seen McNeill take a gun from Washington.
Susie Jenkins' testimony corroborated that of her brother. She testified that she had not seen a gun, and that she did not remember whether she had previously told anyone, including the police, that, after coming down the stairs, she had seen a gun in Washington's right hand or that McNeill had used his foot to take a gun away from Washington. She also testified that she did not remember telling the police that, while McNeill was making the 911 call, Washington asked for his gun back. On the stand, she was combative, aggressive, uncooperative, and demonstrated by her demeanor and answers strong dislike for police and other law enforcement. She referred to the assistant U.S. Attorney on one occasion as "you're a trip," and on cross examination stated that she "stayfs] mad" and is "always mad." Her demeanor on the stand was consistent with her testimony that, after police arrived at 37-39 Maple Street on December 5, 2001, she challenged them on whether they had a proper warrant to enter the second floor apartment and did not permit any police officer in her own apartment but gave an interview in the first floor apartment.
Officer Hartnett, the only police officer on the scene in the aftermath of the McNeill/Washington encounter to interview either Vincent or Susie Jenkins, testified about his interviews of them, claiming that both independently stated they had seen Washington in the front doorway on the porch bent over with a gun in his hand, and that Susie Jenkins reported she observed McNeill place his foot on Washington's *419 wrist and take a gun away from him and she heard Washington asking for his gun back during the 911 call.
In stunning contrast to Susie Jenkins courtroom demeanor, Officer Hartnett testified on cross examination that not only was Susie Jenkins entirely cooperative and generally pleasant when he interviewed her, but she was neither hostile nor aggressive, and, without hesitation or argument, permitted Officer Hartnett to interview her in the kitchen of her own third floor apartment.
Soradi testified that she did not recollect whether Susie Jenkins had said anything to her about seeing Washington with a gun and that she probably would have remembered if Susie Jenkins had. She also testified, however, that Susie Jenkins had told her immediately after the events of December 5, 2001, that Washington had been asking for his gun back during the 911 telephone call.

D. McNeill's Prior Conviction
At presentment on May 23, 2002, Washington entered a plea of not guilty. By standing order of the District of Connecticut,[2] the Government was required within ten days of the presentment to furnish defense counsel with any prior misdemeanor convictions reflecting on the credibility of any Government witness to the extent the Government knew or should have know of such conviction. By motion filed September 25, 2002, defense counsel moved under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for "[a]ny felony criminal convictions and any misdemeanor convictions which involved dishonesty or a false statement for all Government witnesses." Doc. # 62. By response filed two days later, the Government represented that it was "not aware of any felony convictions and/or misdemeanor convictions for dishonesty or false statements for any of the witnesses it intended] to call at trial." Doc. # 63.
On the afternoon after the first day of evidence when the 911 tapes were played and Soradi testified, the Government provided defense counsel with a police report from the St. Lucie Florida Sheriffs Department regarding McNeill's 1998 misdemeanor conviction for Making a False Report of a Crime to Law Enforcement. The police report indicates that it was sent by facsimile from the St. Lucie Sheriffs Department at 11:25am on October 3, 2002, and then relayed by facsimile to defense counsel's office over three hours later.
A stipulation regarding the conviction was read into the record during cross examination of Government witness Officer Hartnett as follows:
The United States and Anthony Washington stipulate and agree for all purposes of the trial of the above captioned matter that, in or about July of 1998 Joseph McNeill pleaded guilty to a misdemeanor in St. Lucie, Florida for Making a False Report of a Crime to Law *420 Enforcement, in that he falsely reported that a girlfriend had stolen his telephone calling card, when in fact he had loaned her the card and $375 in telephone calls had been made. A fine of $546 was imposed.
Defense counsel also re-called Soradi during Washington's case, and attempted to utilize the conviction to demonstrate that Soradi did not in fact know McNeill as well as she thought, seeking the inference that she therefore lacked knowledge of whether McNeill kept a firearm as of December 5, 2001.
After the guilty verdict was returned, federal public defender investigator Robert Eaton Porter conducted inquiries into McNeill's prior conviction. By affidavit accompanying the instant motion, Porter represents: 1) Because he assisted at trial, he did not have an opportunity during trial to search actively for the witnesses listed in the police report; 2) Two weeks elapsed between the time he began his search until he was contacted by one witness, Lynn Butterworth ("Butterworth"); 3) Butterworth related that McNeill had been her boyfriend from July of 1997 to October of 1998, and was physically abusive to her on at least two occasions; and 4) Butterworth related circumstances surrounding McNeill's misdemeanor conviction, including that when she discovered the charges on their phone bill, McNeill said that a friend had stolen his calling card; that McNeill then reported the card "theft" to the police as further cover up; and that in her presence, McNeill falsely denied to the investigating officer that he had in fact given the credit card to a Sharon Stanko, with whom Butterworth later discovered McNeill had been having an affair.[3]

II. Standard
Fed.R.Crim.P. 33, which permits the Court, upon defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires," allows "`broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.' " U.S. v. Ferguson, 246 F.3d 129, 133 (2d Cir.2001)(quoting US. v. Sanchez, 969 F.2d 1409, 1413 (2d Cir.1993)). Describing the standard applied to claims that the verdict was against the weight of evidence, the Second Circuit has stated:
The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record support the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.
Id. at 134 (citations and quotations omitted).
There are numerous grounds on which the motion may be predicated, including prosecutorial misconduct and late disclosure of material evidence. See generally 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice and Procedure § 555-56 (2d ed. 1982 & Supp. 2003).

*421 III. Late Disclosure of McNeill's Conviction

A. Law Derivative of Brady v. Maryland

The Second Circuit has summarized the Brady obligation in a case involving late disclosure:
To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation... to disclose that evidence to the defendant. Information coming within the scope of this principle ... includes not only evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.
Leka v. Portuondo, 257 F.3d 89, 98 (2d Cir.2001)(quoting U.S. v. Avellino, 136 F.3d 249, 255 (2d Cir.1998)).
There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
Id. at 98 (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Those components are analyzed in the following discussion.

B. Favorable Evidence
There is little doubt that McNeill's conviction for falsely reporting a crime to law enforcement was evidence favorable to Washington. McNeill's testimony from beyond the grave preserved in his taped 911 call to authorities was the sole affirmative evidence of Washington's gun possession. Thus, evidence that could cast doubt on McNeill's veracity or motivation for statements in his 911 call was certainly favorable to the defense.

C. Failure to Disclose
Under Brady and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense. The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation. Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant.
Id. at 99-100 (quoting U.S. v. Payne, 63 F.3d 1200, 1208 (2d Cir.1995)). McNeill's misdemeanor conviction reflecting on his credibility was required to be disclosed ten days after defendant's arraignment by standing order of the District of Connecticut. The Government provides no explanation for its very belated disclosure, how it came upon the existence of the conviction so long after it represented there was none, or whether customary NCIC checks had failed to reveal this conviction or the Government had simply failed to make such inquiry, notwithstanding its obligation to do so.

1. Suppression
Washington argues that members of the prosecutor's office must have been in possession of evidence relating to McNeill's conviction in order to have made a specific request to the St. Lucie Sheriffs Department. He further argues that because the Government had a duty to disclose its witness McNeill's prior misdemeanor conviction, its standard NCIC check of its witnesses (to which defense counsel has no access) would have been *422 routinely performed and would have revealed McNeill's conviction. Since McNeill was the Government's key witness, the Government's failure to disclose the existence of his conviction, which was uniquely within its ability to find, amounts to "suppression." The Court agrees.
The Government provides no case law to the contrary, and instead focuses only on the irrelevant issue of the Government's good faith, and on defendant's opportunity to utilize the conviction to impeach Officer Hartnett's and Soradi's credibility. The Government is silent as to why its discovery produced after arraignment omitted the required prior conviction disclosure, whether it or its case agents knew about the conviction before October 3, 2002, or what prompted inquiry of the St. Lucie Sheriffs Department in Florida. The silence is especially disturbing in light of the fact that McNeill died approximately five months prior to the start of trial, thus making this particular conviction of pointed significance.
In commenting on the prosecutor's failure to learn of information known only to police investigators until after trial, the Supreme Court stated,
In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that `procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.' Since, then, the prosecutor has the means to discharge the government's Brady responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.
Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555,131 L.Ed.2d 490 (1995).

2. Late Disclosure
The Government argues that its disclosure after the first day of trial permitted defense counsel adequate time to use McNeill's conviction during cross-examination of Officer Hartnett and direct examination of a re-called Soradi to impeach the 911 call. The Government presumably thereby attempts to invoke the doctrine that "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." Leka, 257 F.3d at 100. The Court disagrees that the timing of Government's disclosure afforded defendant's counsel the opportunity to take full advantage of this important evidence:
[O]nce trial comes, the prosecution may not assume that the defense is still in the investigatory mode....
...
[W]hen a disclosure is first made ... when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.
...
Moreover, new witnesses or developments tend to throw existing strategies and preparation into disarray.
Id. at 100-01. Here, in the midst of a heated and short trial, there was no opportunity for the defense to weave McNeill's conviction into its overall trial strategy. Defense counsel no doubt would have liked to utilize McNeill's conviction on the first day of trial to mitigate *423 the effect of the damning 911 tapes right after they were played, or to impeach Soradi's familiarity with McNeill during cross-examination immediately following her direct testimony as a Government witness. Further, depending on what a deeper investigation of McNeill's prior conviction yielded, the defense may have called Butterworth to testify under Fed. R.Evid. 608(a) to her opinion of McNeill, indicated by Porter's affidavit, to the effect that McNeill was a wily and deceptive person and/or had a capacity or penchant for persistent lying even to law enforcement.
Defense counsel could have sought to impeach McNeill on the 911 tapes by presenting extrinsic evidence of the underlying details of McNeill's conviction, on the theory that Fed.R.Evid. 806 provides
When a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.[4]
Thus, rather than permit (by operation of Fed.R.Evid. 608(b)) McNeill's death to foreclose Washington's opportunity to demonstrate the untruthful character of his accuser, he could have sought to analogize the circumstances of McNeill's 911 statements to those for which McNeill was convicted in 1998 to discredit the one piece of evidence substantiating Washington's gun possession, and the Court's discretion could be appropriately exercised to admit such extrinsic evidence:
Rule 806 applies, of course, when the declarant has not testified and there has by definition been no cross-examination, and resort to extrinsic evidence may be the only means of presenting such evidence to the jury.
U.S. v. Friedman, 854 F.2d 535, 570 n. 8 (2d Cir.1988); but see U.S. v. Saada, 212 F.3d 210, 218-222 (3rd Cir.2000)(rejecting Friedman and holding that extrinsic evidence of misconduct is not permitted where death forecloses eliciting facts on cross-examination on the grounds that Fed.R.Evid. 806 does not modify Rule 608(b)'s prohibition on introduction of extrinsic evidence); see also U.S. v. White, 116 F.3d 903, 920 (D.C.Cir.1997).[5]
Whether McNeill's past conduct actually casts doubt on the 911 tape, however, must be "determined by comparing the circumstances of the past conduct with those surrounding the hearsay statements admitted into evidence." Friedman, 854 F.2d at 570. Here, one of defense's theories *424 at trial included the suggestion that the gun belonged to McNeill,[6] he had had it in his possession during a confrontation with a drugged Washington, he believed Vincent and Susie Jenkins had seen the gun in his hand while he stood over Washington, and, believing himself to be therefore in problematic circumstances, he dropped incriminating lies into the tape of the 911 call to extricate himself from any possible subsequent trouble. At this juncture, the Court cannot conclude that the extrinsic evidence of McNeill's 1998 conviction is of no relevance or is excludable under Fed.R.Evid. 403. The police report and Butterworth's representations demonstrate that McNeill, when confronted with a dicey personal situation, attempted to extricate himself by falsely accusing another, bolstering his falsity by involving law enforcement officers.
Accordingly, under these circumstances, where the Government's late disclosure curtailed the effective use of McNeill's conviction by the defense at trial for impeachment purposes, the Court concludes that McNeill's conviction was suppressed within the meaning of Brady. Having been surprised after the close of evidence on the first day of a short trial, defense counsel could not be expected to sacrifice valuable and scarce trial preparation time and personnel resources to investigate the circumstances surrounding McNeill's prior conviction, which he surely would have done had he been timely apprised of the conviction and in a position to carefully evaluate the uses to which it might be put at trial. See Leka, 257 F.3d at 102-03.

C. Materiality
[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal(whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) .... [The] touchstone of materiality is a `reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A `reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.'
Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Thus, because the materiality determination is at base an evaluation of confidence in the verdict, immateriality is the more likely conclusion where guilt is supported by overwhelming evidence. See Leka, 257 F.3d at 104; U.S. v. Orena, 145 F.3d 551, 559 (2d Cir.1998). Conversely, evidence of impeachment will be considered material "if the witness whose testimony is attacked supplied the only evidence linking the defendant ] to the crime ... or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." U.S. v. Wong, 78 F.3d 73, 79 (2d Cir.1996)(quotations and citations omitted). Here, the suppressed evidence bears directly on the credibility *425 of the sole witness establishing the critical element of gun possession required for Washington's conviction. Although the jury was surely permitted to credit deceased McNeill's testimony against that of live Susie and Vincent Jenkins, it did so without as complete a context as it had for the Jenkins' testimony, thus undermining confidence that Washington received a fantrial.

IV. Prosecutorial Misconduct

A. Legal Standards
Justice Sutherland's opinion is the cornerstone for any discussion of prosecutorial misconduct:
The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Berger v. U.S., 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
As a general rule, "inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." U.S. v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Rather, such misconduct "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." Id. at 12, 105 S.Ct. 1038. Generally and consistent with the above quoted section of Berger, solitary remarks and other types of minor misconduct occurring during the course of a lengthy trial are unlikely to occasion the requisite prejudice against the criminal defendant for overturning a conviction. See U.S. v. Tutino, 883 F.2d 1125, 1136 (2d Cir.1989); U.S. v. Sprayregen, 577 F.2d 173, 175 (2d Cir. 1978). On the other hand,
[W]here the Government's case involves close factual issues and its proof of an element of the crimes alleged leaves room for a reasonable inference inconsistent with guilt, we will scrutinize claimed error with particular care. Error which may be deemed relatively minor in other circumstances may reach prejudicial proportions in a close factual case such as this.
U.S. v. Grunberger, 431 F.2d 1062, 1066-67 (2d Cir.1970); see also U.S. v. Burse, 531 F.2d 1151, 1155 (2d Cir.1976)("Perhaps if the case against Burse had been stronger, these improper comments would be of less significance. However, in an admittedly close case such as this, prosecutorial misstatements take on greater importance, whether those statements are intentional or not."); U.S. v. White, 486 F.2d 204, 204 (2d Cir.1973)("When, as in the instant case, the trial is short and devoid of any other claims of error, seemingly trivial prosecutorial impropriety may stand out in bold relief."). Ultimately, "[t]o warrant reversal, the prosecutorial misconduct must cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." U.S. v. Elias, 285 F.3d 183, 190 (2d Cir.2002).
*426 To implement these standards, the Second Circuit utilizes a three factor inquiry, evaluating "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of the conviction absent the misconduct." U.S. v. Friedman, 909 F.2d 705, 709 (2d Cir.1990); see also Elias, 285 F.3d at 190; U.S. v. Burns, 104 F.3d 529, 537 (2d Cir.1997); U.S. v. Modica, 663 F.2d 1173, 1181 (2d Cir.1981).[7]

B. Severity of the Misconduct

1. Cross-Examination of Moore
The defendant called Moore as his key witness, presumably (at least initially) to portray McNeill as a large, belligerent, alcoholic who intimidated Moore, made unauthorized entries into her apartment, and, in December 2001 after the vandalism targeted at her car (which Washington drove), was looking for an opportunity to evict Washington from the residence,[8] and thus had a motive to set him up. She also testified of her certainty that Washington kept no gun in her apartment, which she knew from her rigorous house keeping standards.
During the course of an incendiary cross-examination, the prosecutor engaged in two instances of severe misconduct. The first relates to his persistence in alluding to the substance of events of November 22, 2001, see supra pp. 417-418, and the second to the prosecutor's sustained barrage of questions attacking Moore's credibility regarding her answers to questions about pre-trial conversations she had had with him and others in the prosecutor's office.

a. Testimony Regarding Incident of November 22, 2001
Moore testified on direct that she told the investigating officer that the source of the vandalism on November 24, 2001 may have been payback directed at her boyfriend (Washington) for his intervention in an "argument" a couple of *427 nights prior to the windshield destruction. Moore denied knowledge of any details of the argument other than its locus at the Kangaroo Club. Although some of the substance of Moore's testimony about the events of November 22, 2001 had been elicited earlier by the Government on its re-direct of Officer Harkins (the officer who had investigated the windshield smashing) and defense counsel, at least in part, engaged in the inquiry with Moore to rebut the officer's previous testimony, specifically that related to Moore's alleged failure to cooperate with the police investigation, defense counsel's questions opened a small door in the penumbra of the Court's pre-trial preclusion of Washington's and other's activities on that night: permitting cross-examination on Moore's knowledge of Washington's involvement in an "argument" at the Kangaroo Club (but not the ensuing gun battle, transport to Yale New Haven for treatment of a gunshot wound, and recovery of a gun inside of an automobile in which Washington had been). However, on cross-examination, the prosecutor attempted to elicit testimony regarding not only Moore's knowledge of the events at the Kangaroo Club on November 22, 2001, but also to suggest the existence of other events on that evening notwithstanding the Court's pretrial order, using questions replete with reference to facts not in evidence regarding which Moore repeatedly denied knowledge.
After sustained questioning about the events of November 22 suggesting Washington's involvement in a "physical confrontation," to which Moore persistently responded that her knowledge was limited to the fact that Washington had gone out and intervened in a verbal dispute at the Kangaroo Club,[9] the prosecutor continued:
And that was it. Then he went home [from the Kangaroo Club], but you knew also, did you not, ma'am, that just two days before your window was smashed, okay, so that would have been on November 22 of 2001, you knew that there was another matter involving Mr. Washington that had created a problem, didn't you?
Moore again answered no. When the prosecutor began the question anew, defense objected and the prosecutor withdrew the question. Nonetheless, the prosecutor persisted in the same area, questioning Moore again about "another problem" and "what was going on in [Washington's] life," and even suggesting his personal contrary knowledge with the question "You didn't know anything about that [i.e. the "another problem"]?" Moore continued to reiterate her earlier responses.
*428 After drawing another objection from the defense and the Court's reminder that Moore had answered the questions in the negative, the prosecutor asked Moore if she knew where Washington was two days prior to the window-smashing, to which she again responded the Kangaroo Club. The prosecutor then continued:
Do you remember ma'am, whether or not in addition to being in the Kangaroo Club he had occasion to be with any law enforcement authorities?
Before Moore could answer, defense objected; the Court sustained the objection, directed the prosecutor to move to the next area and advised that it would hear argument on the objection at the recess.
However, the prosecutor did not wait until the break. Woven throughout questioning on other topics, the prosecutor continued to press with questions about the events of November 22, 2001 at the Kangaroo Club, suggesting personal knowledge both by references to a "fight," and repetitive mining with references to an "altercation," and "a dispute with some unknown black males" at the Kangaroo Club, in the face of Moore's continued and consistent denials. Reaching a crescendo, the prosecutor asked whether Moore knew Washington was "going out at night, going to clubs, getting in altercations." Defense counsel objected and, in response to the Court's direction to rephrase the question, the prosecutor again demonstrated personal knowledge and moved towards the area prohibited by the Court's pre-trial ruling:
On that point, Ms. Moore, is the altercation at the Kangaroo Club the only instance that you are aware of that Mr. Washington had problems?
Defense objected and the Court sustained. The prosecutor then asked again whether the altercation at the Kangaroo Club was the only instance of which Moore knew Washington had been in some type of altercation. Defense properly objected on the basis of the Court's prior rulings.
At the recess, after a lengthy colloquy, the Court reaffirmed its prior rulings, telling the prosecutor that
if [Moore says] she knows nothing about November 22 other than [Washington] was at the Kangaroo Club and not his whereabouts at anytime thereafter, then the only way that you can get into that will be to describe exactly what is very prejudicial and has been precluded, and if she doesn't have knowledge, it doesn't have any purpose. So, your questioning is going to have to be something other than in a full-court cross-examination mode to establish any foundation for going into the details of November 22.
The Court gave the prosecutor limited leave to ask whether Moore knew where Washington was from 2 to 5am on November 22, 2001 because of Moore's direct testimony on the events of November 22, 2001, and because she had also testified that Washington calls her and lets her know his whereabouts.
Moore added to her prior testimony only that, after Washington went to the Kangaroo Club, he went to a pizza shop because "after the club they go get something to eat." This was consistent with her prior testimony because she had previously responded to questions regarding the altercation, which she maintained occurred at the Kangaroo Club. However, despite answering that she only knew he was at the Kangaroo Club and then a pizza shop, the prosecutor repeatedly asked questions suggesting he had information to the contrary (e.g. "He was at a pizza shop. And you're telling this jury that under oath, right?"; "If I told you he was someplace elsewithdrawn."; "Do you in fact know, ma'am, that he was not at some pizza shop between two o'clock and four o'clock on that date, that he was at another location?"; *429 and "So, if he was someplace else involved with some other people in an event that would be -"), before the Court sustained defense counsel's objection.
The prosecutor's sustained inquiry here was improper because it both disregarded the Court's explicit instruction to limit questions to clarifying Moore's personal knowledge and suggested the prosecutor's personal knowledge of Washington's other whereabouts, without apparent grounds to believe that Moore knew differently. Moore's testimony is not inconsistent with the police interrogation transcripts of the two individuals whom Washington had taken to the New Haven Hospital. The Government's contention that defense counsel consented to this line of inquiry is without merit. Defense counsel consented to questions eliciting Moore's state of mind (namely, concern that the windshield smashing incident was related to Washington), not to the specifics of the details underlying the events of November 22, 2001.

b. Pre-Trial Discussion Between Moore and Prosecutor
In a series of cross examination questions, the prosecutor sought to attack Moore's credibility by questions directed to whether she had refused to talk with anyone from the U.S. Attorney's office about the case. Moore emphatically maintained that she had not refused to talk to the prosecutor or any investigator, that no investigators even contacted her, that she would have been willing to discuss the case, and that she had actually called the prosecutor's office herself and spoken with him.
The prosecutor repeatedly argued with Moore over what Moore had said in conversations with him and his office, for example,
Q. Would it be a fair statement, ma'am, you have refused to talk to any investigator in this case from the prosecution?
A. Absolutely not. When I was subpoenaed I called the office and I believe I spoke with you, Mr. [ ].
...
Q. And it would be a fair statement on a number of occasions investigators asked to speak to you about what you knew concerning this matter and you refused to talk to them?
A. That's not true. No investigators at all got in contact with me. In fact, when I was subpoenaed I was surprised.[10]
In response, Moore responded that she had not refused to talk with the prosecution, even once recalling a conversation with the prosecutor:
No, I didn't, sir. You asked me what can I tell you about the matters when I called you. I said I don't have anything to tell you because I was not there that day.
Unrelenting, the prosecutor continued with similar questions, including "you refused to talk to anybody from the prosecution on this matter, didn't you?," and questions implying that Moore had some duty to come forward with information to the prosecutor and even the Court.[11] Moore maintained *430 her insistence that she had not refused to talk to anyone and would have been willing to talk if asked.
On re-direct, Moore reiterated her position that investigators had not attempted to contact her about the subject matter of the case and that she had telephoned the prosecution three times, and, on one occasion was told that the prosecution would not be needing her as a witness.[12]
The prosecutor's re-cross made himself a witness, and strongly implied that by virtue of his personal involvement, he knew Moore's answers to be untrue:
Q. Ma'am, just with respect to counsel's last few questions, it's a fair statement, is it not, that you called the United States attorney's office in response to the subpoena and there was a conference call, right? Right. So there is somebody listening to anything that you said; isn't that correct?
A. No, sir.
Q. And the only thing you wanted to know is when you had to come to court; isn't that right?
A. Yes.
Q. And with respect to being willing to answer questions about this matter, you wouldn't answer questions; isnt' that right?
A. Mr. [], if you had asked any questions I would have did my best in assisting.
Q. I can't make myself a witness. Is it a fair statement, ma'am, with respect to when you called, you would not provide any information about these matters?
A. No. If anyone asked me any questions I would have answered them.
The resulting credibility attack Moore, pitting the weight and credibility of the U.S. Attorney against the defense's key witness, was improper and prejudicial. The Second Circuit condemned factually analogous conduct in U.S. v. Puco, 436 F.2d 761 (2d Cir.1971). There, the critical trial witness on defendant's involvement in an illicit drug transaction denied both knowledge of the defendant and the defendant's participation in the subject drug transaction. The prosecutor then attempted to elicit from the witness post-arrest statements the witness had made to the prosecutor, asking, "Did you tell me" or "Do you recall asking me." The witness, although agreeing to some of the questions, maintained his denials about the defendant. The Second Circuit commented,
We find this contention of appellant that prejudicial error was injected here well taken. Using this statement, which was never admitted into evidence against either defendant, in this way in effect placed the credibility of the prosecutor himself before the jury and was therefore highly prejudicial. The prosecutor by his reading from the purported statements and the form of his questions was plainly representing that [the witness] had in fact made statements to him. This practice has been widely condemned as this court noted in a factual situation very similar to the present case.
Id. at 762. On the sole basis of the prosecutor's having placed his own credibility in the balance against that of the witness, the appellate court reversed and remanded for a new trial. See id. at 763. Similarly, here, the prosecutor used questions to imply to the jury his contrary account of what Moore had said to him. The clear import to the jury was that Moore was lying and had obstructed justice to aid the *431 defendant. Further, although the prosecutor referred to other investigators and even to third persons listening to at least one conversation, no subsequent proof was offered to impeach Moore's responses. The Supreme Court, in Berger, eschewed this very prosecutorial tactic. See Berger, 295 U.S. at 84 n. *, 55 S.Ct. 629.

2. Summation and Rebuttal Summation
The Government's summation and rebuttal summation were both replete with improper argument. The major areas of impropriety were personal vouching, impugning of defense counsel and his arguments, and referring to facts not in the evidence.

a. Personal Vouching
It is well settled that it is improper for a prosecutor to interject personal beliefs into a summation.... While we recognize that occasional use of ... rhetorical devices is simply fair argument ..., we stress that it is a poor practice, one which this court has repeatedly admonished prosecutors to avoid ... for prosecutors to frequently use rhetorical statements punctuated with the excessive use of the personal pronoun "I". It is a perfectly acceptable practice for a prosecutor to use language in addressing the jury such as "you are free to conclude," "you may perceive that," "it is submitted that," or "a conclusion on your part may be drawn," to mention only a few examples of unobjectionable phraseology. It is obligatory for prosecutors to find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors.
U.S. v. Nersesian, 824 F.2d 1294, 1328 (2d Cir.1987); see also U.S. v. Modica, 663 F.2d 1173, 1181 (2d Cir.1981)(per curiam). Improper vouching includes use of the following types of phrases: use of first person pronouns in connection with assertions that a witness was correct or right; introduction of sentences with "I think it is clear," "I am going to suggest to you," "I suggest to you," "I'm telling you," or "I believe on the basis of what you have heard"; use of rhetorical questions such as "was [the witness] correct?" followed by "the answer is yes" or simply "yes"; other phrases such as "Does it make sense I think it does," and "I don't think we have to guess," or "I think it is important." See Nersesian. 824 F.2d at 1327-28; Modica, 663 F.2d at 1181.[13] The repeated use of such rhetorical devices "runs the risk that the jury may think the issue is whether the prosecutor is truthful, instead of whether his evidence is to be believed," Modica, 663 F.2d at 1181, and therefore "[a] prosecutor should exercise restraint to avoid needless personal references, without sacrificing the vigor or effectiveness of his argument." Id. Further, substantive commentary on the truth or falsity of testimony or evidence, with or without this offending phraseology, is likewise to be eschewed. Id. at 1178-79; see also e.g., U.S. v. Young, 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)("Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence.").
Whether use of offending phraseology and other rhetorical devices amounts to prejudicial vouching must be examined *432 in the context of the case as a whole. Thus, in Nersesian, the prosecutor's use of sixty-five such phrases during a forty three page rebuttal did not warrant reversal where the initial 123 page summation contained no objectionable references, the jurors deliberated for ten days, the trial lasted longer than five months, the prosecutor did not disregard rulings of the court, the judge instructed the jury that the lawyers' arguments were not evidence, and the evidence was "clearly strong." See Nersesian, 824 F.2d at 1328 and 1329-30. Similarly, in Modica, although the prosecutor used offending rhetorical devices frequently in summation and other improper remarks in his rebuttal, the Second Circuit did not reverse the conviction because the prosecutor's improper conduct occurred only during closings and not otherwise in the six day trial, the prosecutor did not disregard rulings of the court, and "the case against appellant was overwhelming; he was caught red-handed, and his explanation was implausible and refuted." Modica, 663 F.2d at 1182. The appellate court reaffirmed the general principle that,
Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal.
Id at 1181.
By the Court's count, the prosecutor used phrases such as "I think," "I would suggest to you," "I believe," and other objectionable rhetorical devices at least thirty times in the opening twenty-six page summation when providing substantive commentary on the credibility of the witnesses and the government's version of the facts. With respect to the critical element of possession, the prosecutor argued,
and the testimony and evidence in this case, I respectfully suggest to you, relating to possession is clear.
And, in another place,
But if you look at the totality of the circumstances here and listen to [the 911 tape] in context, I would respectfully suggest to you that the context and indicia of the reliability of the 911 tape shows and establishes beyond any real question as to what was occurring here.
And similarly with respect to the requirement of an interstate nexus, the prosecutor stated,
Had this weapon crossed over state lines sometime prior to December 5, 2001? Well, what is the evidence in that regard? Again, I would suggest to you that the evidence is overwhelming as to that element.[14]
*433 Thus, by the end of the Government's summation, the jury may well have found it impossible to ignore the prosecutor's personal views on whether the witnesses spoke the truth or what evidence was credible or what weight to give it. See Modica, 663 F.2d at 1178. The defense lodged no objections to the prosecutor's summation and, unfortunately, the Court, reluctant to interrupt sua sponte, gave no curative instructions in relation to the prosecution.
Defense counsel's closing argument was also replete with expression of personal views on the credibility of the witnesses and evidence.[15] Misconduct related to personal vouching in the Government's rebuttal summation would necessarily be evaluated in light of what some courts have termed the doctrine of "invited response," see Young, 470 U.S. at 11, 105 S.Ct. 1038, and thus defense counsel's improper conduct would reflect on whether or not the prosecutor's subsequent conduct led the jury astray. See id. at 12, 105 S.Ct. 1038. The Supreme Court, however, has made clear that two such wrongs do not make it right, and "the better remedy ... would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond." Id. at 13, 105 S.Ct. 1038. "[T]he prosecutor at the close of defense summation should [object] to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury." Id, Here, that is exactly what happened.
After defense counsel concluded his closing argument and the jury took a brief recess, the assistant U.S. Attorney asked the court to instruct the jury that it is improper for counsel to represent personal beliefs. The prosecutor protested the Court's initial plan to augment its jury charge, stating,
It's not the Court's intention to say something to the jury until then? I'm a little bit at a disadvantage because I assume if I express a personal opinion or belief, I don't think that it's appropriate, but on the other hand, after listening to a half an hour or more of personal beliefs ..., it seems a little bit less than inadequate to have a reference to it on page 12 of a lengthy-well, not terribly lengthy, but some lengthy instructions from the Court.
On reconsideration, the Court gave the following curative instruction to "right the scale," Young, 470 U.S. at 13, 105 S.Ct. 1038, and to stave off further improprieties:
We will have the final summation by the government. Please remember that summations are not evidence, and also I want to make clear to you that representations by counsel as to any personal belief in what the evidence shows is not properly before you because the determinations of what the evidence shows or *434 does not show is exclusively your province as jurors.
Although the curative instruction is facially neutral, the jury undoubtedly understood the instruction as a reference to defense counsel's closing. Notwithstanding such implication by proximity, the prosecutor began his rebuttal summation with the clear insinuation that defense counsel had made improper argument, leading with:
I would ask you, ladies and gentlemen of the jury, to pay particular intention (sic) to the instruction that the judge just gave you, and it may be included in the final charge as well. Personal beliefs of the lawyers is not what's at issue here. It would be no more proper for me to tell you what I believe or to suggest what I may know than it is for Mr. Sigal to stand here and say what he believes or to suggest to you there is something beyond the evidence in this case that's (sic) he's aware of and you're not. That's not proper argument and I'd ask you to listen to the judge's instructions again when she provides them.
The prosecutor continued with a barbed back hand,
I'm not going to take up a lot of your time here, but I do want to address some of the things that Mr. Sigal had to say beyond his personal beliefs on matters....
The prosecutor then proceeded to do exactly what he had just stated he would not, using phrases such as "I would suggest" and "I think" at least twenty-five more times in the course of a twenty-two page rebuttal. The Government's parting foray is noteworthy, as it directly comments on the crucial and sole issue in the case:
... does common sense tell you ... does it make sense that that person might be in possession of a firearm? And I would suggest to you it makes perfect sense, and common sense reading of the evidence, not the suggestions of the attorneys, but the evidence supports that.
I would respectfully submit to you that the answer is a loud and clear yes, that it makes perfect sense that there clearly was a motive for Mr. Washington to possess a gun on December 5th of 2001.[16]
The prosecutor's personal vouching both in summation and in rebuttal, especially after having used the Court's curative instruction to contrast defense counsel's improper argument with his own self-proclaimed proper one, likely impaired the ability of the jury to separate the evidence in the case from the prosecutor's credibility and personal viewpoints, for
[i]t is fair to say that the average jury, in a greater or less degree, has confidence that [the obligation to see justice done in a fair manner], which so plainly rest[s] upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.
Berger, 295 U.S. at 88-89, 55 S.Ct. 629.

b. Impugning of Defense Counsel and Mis-Characterization of Argument
A prosecutor must be careful not to characterize a defense as "fabricated," *435 see White, 486 F.2d at 206 and n. 7, or "woven out of the thread of desperation... that unravels before you," U.S. v. Marrale, 695 F.2d 658, 667 n. 9 (2d Cir. 1982), or to make derogatory comments about defense counsel, see Burse, 531 F.2d at 1154 (improper and potentially derogatory to state "[opposing counsel's name] attempted to give you (the jury) the impression that"). However, in reviewing a prosecutor's (or defense counsel's) comments, specific words or terms do not automatically connote impropriety or trigger the need for a new trial, see White, 486 F.2d at 207, rather specific usage must be evaluated in the context of each trial as a whole, see id., and the prosecutor is entitled to respond to the evidence, issues, and hypotheses propounded by the defense, see Marrale, 695 F.2d at 667; see also U.S. v. LaSorsa, 480 F.2d 522, 526 (2d Cir. 1973)("In view of these attacks against the very integrity of the prosecution the prosecutor was certainly entitled to reply with rebutting language suitable to the occasion."). While oratory and eloquence should not be quenched, "name-calling" is not permissible. See White, 486 F.2d at 207. Ultimately, the rationale against excessive] derogatory remarks against defense counsel (or the prosecutor) is that such remarks can inflame the passions and prejudices of the jury to decide the case on something other than the evidence. See Young, 470 U.S. at 8-9, 105 S.Ct. 1038.
The Government's opening summation was unobjectionable, containing only one allusion to defense counsel's "inventiveness." Defense counsel's closing made no negative references to the prosecutor, except anticipating that the prosecutor would try to divert the jury's attention from problems with the 911 call.[17] Defense counsel's remaining comments were directed to the Government's cross-examination of Moore, accurately represented what the Government was attempting to accomplish, and do not appear improper in context.[18]
By contrast, the prosecutor's twenty-two page rebuttal contained eight instances of pejorative characterization of defense counsel's argument using phrases such as "yarn he would spin" and "out of whole cloth," [19] or explicitly stating that the defense was creating evidence and referring to facts not in the record.[20] Although *436 some reierences fairly characterized defense counsel's argument, the prosecutor could have accomplished a vigorous rebuttal steeped in the evidence of the case without explicitly stating that defense counsel was creating evidence and invoking personal knowledge of facts not in evidence to lead the jury astray.
The prosecutor's sustained commentary on defense counsel's argument is highlighted by instances in which the prosecutor himself misrepresented defense counsel's closing:
Counsel had said to you that with respect to the witnesses in this case that there are two people who are credible, one being Ms. Soradi and the other one being Vincent Jenkins. And then he talks about some portions of Ms. Soradi's testimony. Only he for some reason fails to refer to the fact that Ms. Soradi testified, in fact she testified this very morning, so it's not likely something Mr. Sigal would forget, that indeed Susie Jenkins had told her that with respect to the defendant Mr. Washington, Mr. Washington had been asking to get his gun back, but counsel doesn't mention that.
And why is it that counsel doesn't mention that? Counsel doesn't mention that because it's evidence in this case which is not particularly helpful to the yarn that he would spin by suggesting in the first instance that Mr. McNeill had some kind of he was in some kind of trouble.
Not content with the initial suggestion that defense counsel was deliberately concealing part of Soradi's testimony, the prosecutor a mere two pages later, returned to the same territory:
Mr. Sigal does not, as I indicated, mention to Ms. Soradi testified under oath, a witness he finds credible, and I would agree with him, she was credible, about Susie saying the defendant had been asking for his gun back.
Defense counsel had not only explicitly addressed the impeachment of Susie Jenkins by Soradi, but had given the topic significant attention:
... "He wants his gun."
Well, this is the portion that according to Daniella Soradi Susie Jenkins heard. Susie Jenkins reportedly heard Anthony Washington saying where is the gun. And that's what McNeill is saying that Washington is saying. So, what is going on here? First we have first we have McNeil saying my neighbors are here, then he's saying Susie went downstairs, and then after Susie went downstairs you have the critical portion about "Right now, man." "I don't have it on me right now." "What's he wanting?" "He wants his gun."
Susie Jenkins, by McNeil's own statement, is not there anymore. So, how is it that Susie Jenkins hears any of this? I would suggest to you I don't think Daniella Soradi is lying, I think simply she's getting mixed up probably what has been told to her by the different parties, by Joe McNeill and Susie Jenkins. So, those circumstances just do not make sense.
"The prosecutor was entitled in rebuttal to provide an answering argument, based on the trial evidence, to any argument that defense counsel advanced in summation. He was not entitled, however, to malign defense counsel by accusing him of willingness *437 to make unfounded arguments that were not made." Friedman, 909 F.2d at 709. The prosecutor here was not permitted to accuse defense counsel of intentionally omitting unfavorable evidence in aid of spinning a "yarn" more favorable to Washington when in fact defense counsel had spent significant energy explaining the very problem the prosecutor accused him of neglecting. The prosecutor's repeated attacks on the integrity of defense counsel, especially when coupled with misrepresentation of the batter's argument, likely misled the jury into believing defense counsel was improperly attempting a sleight of hand.

c. Reference to Events of November 22, 2001
Finally, the prosecutor's charge that defense counsel created evidence and relied on facts not in evidence, especially where the prosecutor had lulled the jury by claiming he would not do that,[21] was magnified when, in rebuttal argument, the prosecutor made reference to the events of November 22, 2001 that had been excluded by court order.
As set forth above, by the close of Moore's testimony, it had been firmly implanted in the mind of the jury by the Government's questions that Washington had been involved in some kind of altercation at the Kangaroo Club on November 22, 2001. The prosecutor's improper questions had also alerted the jury to the fact that the altercation included a physical component and involved law enforcement authorities. However, no evidence had been admitted regarding the transportation to the hospital of an individual with a gunshot wound and the subsequent police recovery of a gun from the transporting vehicle.
In opening summation, the prosecutor, while addressing the reprisals resulting from the events of November 22, 2001, stated,
We know that the nature of the altercation was not limited to or the response to the altercation based on the evidence here was not limited to having the windshield smashed because on December 3rd, about a week a little bit more than a week later, there are multiple gunshot wounds gunshot wounds gunshots fired outside that same residence. That same car that the defendant used on a regular basis is damaged by at least one shot that went through the rear passenger door of that car.
No where in the record was there any evidence of "gunshot wounds." In a case involving possession of a gun by a felon, a reference, no matter how fleeting, to "gunshot wounds" can be highly prejudicial, especially where it is discussed in the context of reprisal for Washington's involvement in an altercation. Whether the prosecutor's reference resulted from a mental lapse back to the November 22, 2001 shooting incident or a heat-of-the-moment misstatement, the stark terminology could well have suggested to the jury that there was more evidence about Washington known to the prosecutor but unknown to them. Given that the word "gunshot wounds" was repeated twice and not corrected, there is a serious question whether the jury would have just dismissed the phrase as a substitute for gunshots, as cars are not generally considered wounded but rather damaged. Defense counsel again did not object to the reference.
*438 The chance that the jury might have understood the use of "gunshot wounds" as a misstatement of "gunshots" was diminished by the prosecutor's return to the same territory in rebuttal,
Have you heard evidence in this case that involves anything relating to or regarding firearms on or about December 5th or around December 5th of 2001? I would suggest to you, you did. You heard testimony that this defendant was involved in some kind of altercation, that as a result of that these other events flowed out of it, including shootings, a shooting that occurred on December 3rd, 2001, just two days before the gun was seized by the police.
Thus, the prosecutor informed the jury that "shootings" resulted from the November 22, 2001 altercation, one of which was the shooting of Moore's car on December 3, 2001. Defense counsel did not object to the reference.
Taken together, the cross-examination of Moore suggesting Washington's involvement in a problematic altercation involving law enforcement on November 22nd, the summation reference to "gunshot wounds" in the context of reprisals for the altercation, and the revisiting of the subject with a reference to plural "shootings" in rebuttal closing, likely suggested to the jury that Washington was involved in some type of incident involving guns in the days leading up to December 5, 2001. In light of the weak nature of the Government's case, the Second Circuit's observation bears repeating: "In an admittedly close case such as this, prosecutorial misstatements take on greater importance, whether those statements are intentional or not." Burse, 531 F.2d at 1155; see also U.S. v. Forlorma, 94 F.3d 91, 95 (2d Cir. 1996)("The prosecutor's inaccurate assertion was uttered not once but three times, and with great emphasis. This was not an instance of a trivial misstatement that was likely to pass unnoticed.").

C. Curative Measures
Defense counsel objected repeatedly to the cross-examination of Moore regarding to the events of November 22, 2001, and to one instance of either personal vouching or accusation of creating evidence in the rebuttal summation, but failed to object to the prosecutor's inquiry into his own conversations with Moore, personal vouching, misrepresentation of defense counsel's closing argument, references to "gunshot wounds" and "shootings," and the remaining instances of negative characterizations of defense counsel and his arguments.[22]
The Court consistently sustained defense counsel's objections to the prosecution's questioning Moore about Washington's whereabouts on November 22, 2001. However, simply sustaining the objection to such loaded questions with no curative instruction, would not have prevented the jury from being contaminated with the references in the questions to physical altercation and to law enforcement authorities, or to the embedded impeachment of Moore suggesting the prosecutor's personal knowledge of Washington's real whereabouts.
Further, the one time defense counsel did object to the prosecutor's personal vouching, the Court permitted the prosecutor to continue after it unfortunately blurred the proper standard for argument, namely, indicated that "suggesting" is different *439 from expressing a personal view. That curative measure was not an effective counter to the vouching and accusation in which the prosecutor had just engaged.
Finally, in this close case, the Court's pattern jury instruction and reminders to the jury not to consider counsel's questions and arguments evidence were not adequate to counterbalance the pitting of the Government's prosecutor against Moore in a credibility contest, the information leaked through questions and argument regarding Washington's whereabouts and involvement in the altercation on November 22, 2001, the impugning of defense counsel and mischaracterization of his argument, and excessive vouching by the prosecutor. See Modica, 663 F.2d at 1182 ("The court's pattern instruction to the jurythat the arguments of counsel are not to be considered evidencewas proper, but was an insufficient response to the prosecutor's conduct."). The Court believes it failed to adequately discharge its duty to "deal promptly with [improper argument] by either counsel," Young, 470 U.S. at 9, 105 S.Ct. 1038, and to "maintain decorum in keeping with the nature of the proceeding," id. at 10, 105 S.Ct. 1038, giving undue weight to the principle that "interruptions of arguments ... by ... the presiding judge are matters to be approached cautiously," id. at 13, 105 S.Ct. 1038.

D. Certainty of Conviction
This was hardly a case where the evidence against Washington was overwhelming. A sole piece of evidence, a tape recording of a 911 telephone call, obliquely provided the only substantive evidence of his guilt. The only two other percipient witnesses affirmatively denied at trial that they had seen any gun, much less one in Washington's possession. The impeachment offered by Officer Hartnett was difficult to reconcile with Susie Jenkins testimony, although the impeachment of her by Soradi seemed somewhat more credible. And while the 911 tape has an allure of unimpeachability, the speaker on it was by all accounts a belligerent, alcoholic, bar room fighter, who had owned a firearm in the past and, more importantly, had been convicted of previously making a false report of a crime to law enforcement.
The misconduct at issue juxtaposed the credibility of the U.S. Attorney against the defense's key witness, personally vouched for the Government's witnesses and version of the facts, impugned defense counsel and his arguments, blatantly mischaracterized defense counsel's argument on a critical piece of impeachment testimony relating to Washington's gun possession, and alluded to highly prejudicial facts not in evidence. In such a case with attendant pervasive misconduct, the Court "cannot confidently say that a conviction would have been obtained in the absence of the misconduct." Friedman, 909 F.2d at 710. Accordingly, the Court concludes that it was highly probable that the volume and magnitude of improper conduct by the Government set forth above, inadequately addressed by the Court and defense counsel, caused substantial prejudice rising to the level of a denial of due process and a fair trial for Washington.[23] To paraphrase Berger,

*440 If the case against [Washington] had been strong, or ... the evidence of his guilt overwhelming, a different conclusion might be reached.... [W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded.
Berger v. U.S., 295 U.S. 78, 88-89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

V. Conclusion
As set forth above, the Court holds that the late disclosure of McNeill's conviction as well as the prosecutorial conduct outlined above denied Washington a fair trial. Accordingly, because the "societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence," U.S. v. Mechanik, 475 U.S. 66, 73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), Washington's conviction is vacated, his amended motion for new trial [Doc. # 68] is GRANTED, and a new trial is ordered.
IT IS SO ORDERED.
NOTES
[1] "The United States and the defendant Anthony Washington stipulate and agree for all purposes of the trial of the above captioned matter that, prior to December 5th, 2001, the defendant Anthony Washington was convicted of a crime punishable by imprisonment for a term exceeding one year, that is a felony, in the Superior Court for the State of Connecticut."
[2] "In all criminal cases, it is Ordered:

(A) Disclosure by the Government. Within ten days from the date of arraignment, government and defense counsel shall meet, at which time the attorney for the government shall furnish copies, or allow defense counsel to inspect or listen to and record items which are impractical to copy, of the following items in the possession, custody or control of the government, the existence of which is known or by the exercise of due diligence may become known to the attorney for the government or to the agents responsible for the investigation of the case: (9) ... a list of the names and addresses of all witnesses whom the government intends to call in the presentation of its case-inchief, together with any record of prior felony convictions and of prior misdemeanor convictions which reflect on the credibility of any such witness."
[3] The police report contains a description of the events surrounding McNeill's conviction that recounts McNeill's multiple and persistent lies to law enforcement until he finally confessed and pled guilty.
[4] The explanatory advisory notes comment,

"[The declarant's] credibility should in fairness be subject to impeachment and support as though he had in fact testified. See Rules 608 and 609."
Fed.R.Evid. 608(b), in turn, provides
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning the witness' character for truthfulness or untruthfulness....
[5] Although, under the holding of Saada, the tension between Rules 806 and 608(b) is somewhat alleviated where defense counsel can cross examine the witness to the hearsay statement about the declarant's misconduct as it bears on the declarant's character for truthfulness or untruthfulness, see Saada, 212 F.3d at 221, no such consolation prize exists for defendants such as Washington, against whom hearsay statements are admitted into evidence through a witness who has never had any contact with or any knowledge of the declaranthere, an administrator who oversaw the 911 system in the city of New Haven. See id. at 221 n. 12 and 222.
[6] This suggestion was based on the undisputed testimony that the gun was found in a drawer of a table inside of Soradi's and McNeill's first floor apartment, McNeill had at one time in the past owned a different gun, and Washington's fingerprints were not found on the gun, and the inferences defense counsel sought to draw from Moore's testimony that she was acutely aware of all objects in her apartment (by virtue of daily cleaning) and knew there was no gun there.
[7] Prosecutorial misconduct to which contemporaneous objections are made is reviewed for harmless error, see Young, 470 U.S. at 13 n. 10, 105 S.Ct. 1038, but prosecutorial misconduct to which no objection is raised during trial is reviewed for plain error under Fed.R.Crim.P. 52(b), see Young, 470 U.S. at 14-20, 105 S.Ct. 1038; see also U.S. v. Torres, 845 F.2d 1165, 1172 (2d Cir.1988)(indicating that failure to raise timely objection to alleged improper rebuttal summation implicates review for plain error); cf. also U.S. v. Filani, 74 F.3d 378, 387 (2d Cir.1996)(failure to object to judicial misconduct limits argument on appeal to plain error analysis under Fed. R.Crim.P. 52(b)).

The Court finds little authority addressing whether a trial court utilizes a plain error analysis under Fed.R.Crim.P. 52(b) with respect to assertions of prosecutorial misconduct first raised by defense counsel in a motion for new trial under Fed.R.Crim.P. 33, or whether that standard applies only to appellate review, see e.g. U.S. v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)("[RuIe 52(b)] ... provides a court of appeals a limited power ...."), Young, 470 U.S. at 15, 105 S.Ct. 1038 ("The Rule authorizes the Courts of Appeals...."), notwithstanding the plain language of Rule 52(b), which does not so specify. However, in light of Fed.R.Crim.P. 1(a)(1), there is no reason to conclude that Rule 52(b) would not govern a Rule 33 motion. Thus, in reviewing defendant's claims of prosecutorial misconduct for the first time on his Rule 33 motion, this Court performs somewhat of an appellate role and thus the plain error analysis will be used here. See U.S. v. McBride, 862 F.2d 1316 (8th Cir. 1988); U.S. v. Rapanos, 895 F.Supp. 165, 168 (E.D.Mich. 1995), reversed on other grounds by 115 F.3d 367 (6th Cir.1997); cf. also U.S. v. Brennan, 326 F.3d 176, 186 (3d Cir.2003). See infra note 23.
[8] Soradi acknowledged that McNeill had been a bar room brawler, had drinking problems, was aggressive, loud, and verbally abusive to her, and had shown Moore's apartment to prospective tenants on one occasion without Moore's knowledge.
[9] Examples include:

Q. But you were aware of the fact on November 24th of 2001 that Mr. Washington had had a very recent series of problems; isn't that correct?
A. No, I didn't say serious problem.
Q. Just two days before that he had had a problem, didn't he, ma'am?
A. Well, I said he intervened in a verbal altercation between friends.
Q. But you remember there was an event that occurred two days before, not just an altercation? Let me withdraw it. Let's address that first. You knew of an instance in which Mr. Washington had had some kind of an altercation with people shortly before your window was smashed, correct?
A. Yes.
Q. And you knew that that was a physical confrontation, it wasn't just words; isn't that right?
A. I wasn't aware of anything physical, I just know verbal.
Q. Well, you had talked to Anthony about it, right?
A. Yes.
Q. Right. He had told you what had happened? You knew it was at the Kangaroo Club?
A. Yes.
[10] Other examples of offending questions include: "Wouldn't it in fact be true, Ms. Moore, that you had called to inquire about when you had to be in court and that there were other people that you spoke with, correct? You wanted to know when you had to come to court, correct?"; "And didn't you in fact say you did not want to talk about these matters and wouldn't talk about these matters?".
[11] Defense counsel only objected to the questions implying Moore had a duty to come forward to the prosecutor and the Court with relevant information regarding the case. The Court sustained both objections.
[12] In fact, the Government did not call Moore as a witness.
[13] But see U.S. v. Jaswal, 47 F.3d 539, 544 (2d Cir.1995)(without mention of Nersesian or Modica or explanatory discussion, concluding that "I think you can conclude..." permissible if clearly communicating nothing more than a comment on the evidence).
[14] Other examples in the initial summation include: "I believe that a careful look at the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offence charged...."; "Is there evidence to that effect? I would suggest to you that the evidence does in fact exist"; "Well, what is the evidence [regarding whether the firearm had crossed state lines]? Again, I would suggest to you that the evidence is overwhelming as to that element."; "Based on your review of that particular weapon, I believe you'll find it is exactly what it purports to be... ."; "Ms. Moore, however, refused to provide police with the name of her boyfriend, but in context, I think you can reasonably infer who she was talking about, and I believe she admitted here it was this defendant Anthony Washington. So you know that happened."; "I would again respectfully suggest to you to use your common sense because I think your common sense tells you that the defendant at that point in time had an ongoing reason to be in possession of a handgun."; "I think if you listen to the tape recordings and consider the context and the content of what it is Mr. McNeill said, there is a clear indicia of reliability to these events."; "Susie Jenkins obviously was not happy to be here, and was in some respects, I think to an objective observer, a very difficult witness, but I would suggest to you her testimony also made it clear that the defendant was clearly under the influence...."; "I'd suggest to you then if you apply your reason and your general life experience here, and common sense, the evidence in this case establishes the three elements that the government is required to prove beyond a reasonable doubt."
[15] For example, "Anthony Washington is not guilty of this offense, and it's incumbent upon me to do everything I can to make sure that you understand."; "And why [doesn't McNeill address the gun earlier in the 911 call]? I suggest to you that's because Susie is still in the room with him."; "Moore ... I think she was a credible witness."
[16] Other examples include: "There is no evidence in this case, I would suggest to you, that Joseph McNeill was in some kind of trouble...."; "Have you heard any evidence to [the effect that McNeill owned more than one gun]? I would suggest to you the answer is no."; "... a witness [Mr. Sigal] finds credible, and 1 would agree with him, [Soradi] was credible, about Susie saying the defendant had been asking for his gun back."
[17] "I suggest what the government would like to do and would like you to do is to shift your attention away from the very obvious problems of Joseph McNeill and "I think that it's funny because actually usually it's the defense lawyers that are accused of smoke and mirrors and diversionary attempts...."
[18] "[The prosecutor] was able to insinuate things about Ebony Moore."; "[T]he government wanted you to believe that she had lied to the authorities to sponsor an inmate."; and "There was I believe the implication that she was dishonest because she helps her boyfriend talk to people using three-way calling."
[19] "[H]e, Mr. Sigal, spent a substantial portion of his final argument out of that whole cloth"; "counsel doesn't mention that because it's evidence in this case which is not particularly helpful to the yarn that he would spin"again working this whole cloth"; "To single out Joseph McNeil as being upset and thereby to spin out some broader story unsupported in the record, I would submit to you is not the way in which you should approach this case."; "And I would suggest to you that that is made up out of whole cloth and does not come from the evidence which was admitted in this case and is before you."
[20] "It would be no more proper for me to tell you what I believe or to suggest what I may know than it is for Mr. Sigal to stand here and say what he believes or to suggest to you there is something beyond the evidence in this case that's he's aware of and you're not"; "if he can get you thinking Mr. McNeill was in some kind of trouble and divert your attention there...."; "we can turn your focus away from the evidence in this case"; "What do we know based on the evidence which was admitted in this case, not somehow creating evidence or arguing outside the record or expressing personal beliefs, telling you what I think, but what do you know from the evidence in this case?"; "That's the evidence before you, not the suggestion of counsel as to what he might create or suggest to you the evidence shows or leads him -".
[21] "It would be no more proper for me to tell you what I believe or to suggest what I may know than it is for Mr. Sigal to stand here and say what he believes or to suggest to you there is something beyond the evidence in this case that's he's aware of and you're not".
[22] In addition, defense counsel did object twice during rebuttal to mischaracterization of the evidence and at the end of rebuttal to the prosecutor's alleged lowering of the burden of proof; however, the substance of those objections is now not claimed by Washington or not addressed by the Court.
[23] Because of defense counsel's failure to object to the majority of the prosecutorial misconduct at trial, the analysis of the Court has been undertaken under the plain error standard of Fed. R. Crim P. 52(b), see supra note 7: The misconduct undermined the fundamental fairness of the trial, see Young, 470 U.S. at 16-18, 105 S.Ct. at 1047, by deviating from rules clearly established by controlling case law at the time of Washington's trial, the defendant satisfied his burden to demonstrate that the errors affected the outcome of the trial proceedings by detailing numerous instances of the prosecutor's misconduct and explaining how such misconduct influenced the jury verdict, see Filani, 74 F.3d at 387, and the integrity of the judicial proceeding was affected by the unfair conduct of the U.S. Attorney, see Berger, 295 U.S. at 88, 55 S.Ct. 629. See generally Olano, 507 U.S. at 730-37, 113 S.Ct. 1770; U.S. v. Zillgitt, 286 F.3d 128, 138 (2d Cir.2002).