UNITED STATES, Appellee

v.

Terry A. FLETCHER, Technical Sergeant
U.S. Air Force, Appellant

No. 04-0465

Crim. App. No. 34945

United States Court of Appeals for the Armed Forces

Argued January 25, 2005

Decided September 30, 2005

ERDMANN, J., delivered the opinion of the court, in which
GIERKE, C.J., and EFFRON and BAKER, JJ. joined.  CRAWFORD, J.,
filed a dissenting opinion.

Counsel

For Appellant:  Captain John N. Page III (argued); Colonel
Beverly B. Knott, Lieutenant Colonel Carlos McDade, Major Terry
L. McElyea, and Captain Jennifer K. Martwick (on brief).

For Appellee:  Captain Kevin P. Stiens (argued); Colonel Gary F.
Spencer and Lieutenant Colonel Robert V. Combs (on brief).

Military Judge:  Harvey A. Kornstein


**This opinion is subject to revision before final publication.**

United States v. Fletcher, No. 04-0465/AF

Judge ERDMANN delivered the opinion of the court.

Technical Sergeant Terry Fletcher entered a plea of not guilty to wrongful use of cocaine in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2000). He was tried and sentenced by members to a bad-conduct discharge, one month of confinement and a reduction in grade to E-1. The convening authority approved the sentence, and the findings and sentence were affirmed by the United States Air Force Court of Criminal Appeals in an unpublished opinion. United States v. Fletcher, No. ACM 34945 (A.F. Ct. Crim. App. Feb. 27, 2004).

Trial prosecutorial misconduct is behavior by the prosecuting attorney that "overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." Berger v. United States, 295 U.S. 78, 84 (1935). While prosecutorial misconduct does not automatically require a new trial or the dismissal of the charges against the accused, relief will be granted if the trial counsel's misconduct "actually impacted on a substantial right of an accused (i.e., resulted in prejudice)." United States v. Meek, 44 M.J. 1, 5 (C.A.A.F. 1996). During the findings argument the trial counsel offered her personal views, made disparaging comments about Fletcher and his counsel and drew parallels between Fletcher's

2

case and the legal problems of various entertainers and public religious figures.  We granted review to determine whether the trial counsel's acts constituted prejudicial misconduct.[1]  We find that the trial counsel's comments during her findings argument rose to the level of prosecutorial misconduct and that the misconduct was prejudicial.

BACKGROUND

Fletcher was accused of wrongfully using cocaine.  The Government's case was based on the positive results of two urinalysis tests.  The first urinalysis was performed as part of a random inspection of Fletcher's unit and he voluntarily submitted to the second test.

At trial Fletcher produced several character witnesses who described him as a "truthful person" and a "law abiding citizen" with a "positive moral character."  Fletcher called witnesses from his church who testified about his substantial participation in church activities.  Fletcher also took the stand himself, testifying about his strict religious upbringing, his nearly twenty years in the Air Force, his family life and his involvement in the community.

---

[1] We granted review of the following issue:
    WHETHER THE CIRCUIT TRIAL COUNSEL'S FINDINGS ARGUMENT
    WAS IMPROPER AND MATERIALLY PREJUDICED APPELLANT'S
    SUBSTANTIAL RIGHTS.

After the presentation of the evidence, the trial counsel made a findings argument. (Attached as Appendix I to this opinion.) The argument contained a number of references to the trial counsel's personal opinions about the believability of the evidence and personal comments about the trial defense counsel and Fletcher. In addition, near the end of her argument the trial counsel spoke to the members about a number of entertainers and religious leaders, saying:

> Is religion an indicator of law abidingness? Is it okay to play faith for a get out of jail free card --- nah uh. Do people even with true faith make criminal mistakes? . . . [D]o they use drugs? Yeah. Do they commit adultery on their wives? Ask Jessie [sic] Jackson about his two year old daughter. Ask Jerry Falwell about the hooker that he got caught with having intercourse in a car in Palm Springs. Jim Bakker cheating on his taxes. I challenge you in findings to come up with the rest. I made a huge list but I don't have time to go over them. [Does] the fact that he's done good work mean that he can't use cocaine, nah uh. Dennis Quaid, prolific actor, needed inpatient treatment. Friends, Matthew Perry, fabulous performer, shows up every week. Had to go to inpatient treatment for drugs. How about this one, Robert Downey, Jr., wins an Emmy for the performances that he had during the time . . . he was actually being arrested, charged and showing up positive for having used cocaine.[2]

---

[2] We have included this text and the attached Appendix I because the words used by the trial counsel are a necessary factual predicate to our decision. In so doing the court is not validating the accuracy of the trial counsel's statements with respect to the conduct mentioned or whether the persons named were in fact appropriately linked to such conduct.

DISCUSSION

I.   Prosecutorial Misconduct

The cornerstone for any discussion of prosecutorial misconduct

is Justice Sutherland's opinion in Berger v. United States:

> The [prosecutor] is the representative not of an
> ordinary party to a controversy, but of a sovereignty
> whose obligation to govern impartially is as
> compelling as its obligation to govern at all; and
> whose interest, therefore, in a criminal prosecution
> is not that it shall win a case, but that justice
> shall be done.  As such, he is in a peculiar and very
> definite sense the servant of the law, the twofold aim
> of which is that guilt shall not escape or innocence
> suffer.  He may prosecute with earnestness and vigor -
> - indeed, he should do so. But, while he may strike
> hard blows, he is not at liberty to strike foul ones.
> It is as much his duty to refrain from improper
> methods calculated to produce a wrongful conviction as
> it is to use every legitimate means to bring about a
> just one.

295 U.S. at 88.  The Supreme Court explained that prosecutorial

misconduct occurs when a "prosecuting attorney overstep[s] the

bounds of propriety and fairness which should characterize the

conduct of such an officer in the prosecution of a criminal

offense."  Id. at 84; see also Meek, 44 M.J. at 5

("Prosecutorial misconduct can be generally defined as action or

inaction by a trial counsel in violation of some legal norm or

standard, e.g., a constitutional provision, a statute, a Manual

rule, or an applicable professional ethics canon.").  Fletcher

identifies four categories of alleged misconduct by the trial

counsel:  (1) interjection of her personal beliefs and opinions,

(2) disparaging comments about defense counsel, (3) disparaging comments about the defendant, and (4) introduction of facts not in evidence.

During the prosecution's findings argument, defense counsel objected to a series of comments that attacked him personally. As proper objection was made at the trial level, we will review those comments for prejudicial error. Article 59, UCMJ, 10 U.S.C. § 859 (2000). There was no objection made to the remainder of the trial counsel's comments. Failure to object to improper argument before the military judge begins to instruct the members on findings constitutes waiver. Rule for Courts-Martial (R.C.M.) 919(c). In the absence of an objection, we review for plain error. United States v. Rodriguez, 60 M.J. 87, 88 (C.A.A.F. 2004). Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Id. at 88-89.

1. Interjection of the Trial Counsel's Personal Beliefs and Opinions

It is improper for a trial counsel to interject herself into the proceedings by expressing a "personal belief or opinion as to the truth or falsity of any testimony or evidence." United States v. Horn, 9 M.J. 429, 430 (C.M.A. 1980) (quoting ABA Standards, The Prosecution Function, § 5.8(b) (1971)); see

United States v. Fletcher, No. 04-0465/AF

also United States v. Knickerbocker, 2 M.J. 128, 129-30 (C.M.A. 1977).  When a trial counsel offers her personal opinions, they become "'a form of unsworn, unchecked testimony and tend to exploit the influence of [the] office and undermine the objective detachment which should separate a lawyer from the cause for which [s]he argues.'"  Horn, 9 M.J. at 430 (quoting ABA Standards, § 5.8(b), Commentary at 128).  There are many ways a trial counsel might violate the rule against expressing a personal belief or opinion.  One is by giving personal assurances that the Government's witnesses are telling the truth.  United States v. Young, 470 U.S. 1, 18-19 (1985).  Another is by offering substantive commentary on the truth or falsity of the testimony and evidence.  Id. at 8.

   a.   Improper vouching

   The federal circuit courts are in agreement that improper vouching occurs when the trial counsel "plac[es] the prestige of the government behind a witness through personal assurances of the witness's veracity."  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993) (citations omitted).[3]

---

[3] See also United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003); United States v. Modica, 663 F.2d 1173, 1178 (2d Cir. 1981); United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998); United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997); United States v. Ramirez-Velasquez, 322 F.3d 868, 874 (5th Cir. 2003); United States v. Francis, 170 F.3d 546, 550 (6th Cir. 1999); United States v. Amerson, 185 F.3d 676, 686 (7th Cir. 1999); United States v. Beaman, 361 F.3d 1061, 1065

Improper vouching can include the use of personal pronouns in connection with assertions that a witness was correct or to be believed.  United States v. Washington, 263 F. Supp. 2d 413, 431 (D. Conn. 2003).  Prohibited language includes "I think it is clear," "I'm telling you," and "I have no doubt."  Id.  "Acceptable language includes 'you are free to conclude,' 'you may perceive that,' 'it is submitted that,' or 'a conclusion on your part may be drawn.'"  Id.

In this case, the trial counsel repeatedly vouched for the credibility of the Government's witnesses and evidence.  For example, after discussing the testing methods and cut-off levels, she concluded "we know that that was from an amount that's consistent with recreational use, having fun and partying with drugs."  Emphasis added.  She referred to another exhibit, the drug test results, personally characterizing the exhibit as "a perfect litigation package."  In talking about one of the prosecution's main witnesses, she opined, "It's very apparent from talking to Doctor Jain that he is the best possible person in the whole country to come speak to us about this."

    b.   Unsolicited personal views of the evidence and comments on the defendant's guilt

---

(8th Cir. 2004); Cargle v. Mullin, 317 F.3d 1196, 1219 (10th Cir. 2003); United States v. Cano, 289 F.3d 1354, 1365 (11th Cir. 2002).

8

United States v. Fletcher, No. 04-0465/AF

Improper interjection of the prosecutor's views can also include "substantive commentary on the truth or falsity of testimony or evidence." Washington, 263 F. Supp. 2d at 431. As the Supreme Court has recognized, "Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence." Young, 470 U.S. at 7.

During her findings argument, the trial counsel described the Government's evidence as "unassailable," "fabulous," and "clear". With respect to Fletcher's guilt, the trial counsel said, "it's so clear from the urinalyses that he was doing it over and over," "He clearly is a weekend cocaine user," and "He is in fact guilty of divers uses of cocaine." When describing Fletcher's defense she used words like "nonsense," "fiction," "unbelievable," "ridiculous" and "phony".

The trial counsel's interjection of her personal beliefs and opinions was error. Comments such as the ones that the trial counsel made about Dr. Jain and the prosecution's exhibits could be perceived as putting the weight of the Government behind the statements with the result that the testimony or evidence in question appears stronger than it really is. Berger, 295 U.S. at 88. This is a dangerous practice because "when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to

ignore his views, however biased and baseless they may in fact be." Modica, 663 F.2d at 1178-79.

In addition, when a trial counsel offers her personal views of a defendant's guilt or innocence, as trial counsel did in this case, it may confuse the jurors and lead them to believe that the issue is whether or not the prosecutor is truthful instead of whether the evidence is to be believed. Id. at 1181. As the First Circuit has explained, "Such tactics are not to be condoned. They tilt the scales of justice, risk prejudicing the defendant, and carry the potential for distracting the jury from its assigned task of assessing the credibility based solely on the evidence presented at trial and the demeanor of the witnesses." Perez-Ruiz, 353 F.3d at 9-10. These are results we seek to avoid.

Because defense counsel did not raise any objection at trial, the injection of trial counsel's personal beliefs and opinions must rise to the level of plain error before relief is warranted. We find that the errors here are plain and obvious. Over the course of her findings argument, there are more than two dozen instances in which the trial counsel offered her personal commentary on the truth or falsity of the testimony and evidence. She repeatedly inserted herself into the proceedings by using the pronouns "I" and "we." She put the authority of the Government and her office behind the prosecution's witnesses

and she bluntly concluded that Fletcher was in fact guilty. These errors were blatant and obvious.

### 2. Disparaging Comments About Defense Counsel

Not only is it improper for a trial counsel to interject her personal views into a case, it is also improper for a trial counsel to attempt to win favor with the members by maligning defense counsel. United States v. Xiong, 262 F.3d 672, 675 (7th Cir. 2001) (holding that "disparaging remarks directed at defense counsel are reprehensible"); see also United States v. Ollivierre, 378 F.3d 412, 418 (4th Cir. 2004) (recognizing that it is "improper for a prosecutor to launch a personal attack upon the defense attorney or upon defense lawyers generally"), vacated and remanded by, 125 S.Ct. 1064 (2005); TJAG Policy Memorandum, TJAGD Standards – 2, Air Force Rules of Professional Conduct and Standards for Civility in Professional Conduct, attachment 2, para. 28 (Oct. 15, 2002) (explaining that a lawyer should not "degrade the intelligence, ethics, morals, integrity or personal behavior of others, unless such matters are legitimately at issue in the proceeding").

When one attorney makes personal attacks on another, there is the potential for a trial to turn into a popularity contest. Rather than deciding the case "solely on the basis of the evidence presented," as is required, the members may be convinced to decide the case based on which lawyer they like

11

better.  Young, 470 U.S. at 18.  Disparaging remarks about defense counsel may "caus[e] the jury to believe that the defense's characterization of the evidence should not be trusted, and, therefore, that a finding of not guilty would be in conflict with the true facts of the case."  Xiong, 262 F.3d at 675.  In addition, derogatory comments about opposing counsel can "detract from the dignity of judicial proceedings."  Id.

In this case, trial counsel made disparaging comments about defense counsel's style and also made comments suggesting that Fletcher's defense was invented by his counsel.  Defense counsel objected to the first group of comments, but not to the second group.  Thus, we will analyze the comments suggesting the invented defense under the plain error standard.  In assessing prejudice, we will consider the other erroneous comments that were objected to by defense counsel.

Here, the trial counsel openly criticized defense counsel by accusing him of scaring witnesses, cutting off witnesses and suborning perjury from his own client.  At the start of her rebuttal argument the trial counsel said, "Well, we sure do have different styles.  And I think it actually is going to play for once in the case.  I will not shout at you.  I will reason with you.  I will present evidence and what's fair."  A few pages later, she characterized the defense counsel as "the one with the overpowering and yelling and cutting people off cross

examinations and the wild argument." She then said, "He's the one that could have scared a witness and freaked them out. Me, I won't cut them off. I'll apologize if I do." She later stated, "Well, ask yourselves, do I scare you?"

Defense counsel properly objected to these comments because it was error for the trial counsel to make this type of personal attack. See United States v. Rodriguez-Estrada, 877 F.2d 153, 159 (1st Cir. 1989) (recognizing that "the prosecutor's obligation to desist from the use of pejorative language . . . is every bit as solemn as his obligation to attempt to bring the guilty to account."). Defense counsel's objections were sustained by the military judge.

The defense counsel did not object when the trial counsel suggested that Fletcher's defense was invented by his counsel. The trial counsel referred to Fletcher's arguments as "fiction" at least four times and called one of Fletcher's arguments a "phony distraction." She also called the defense case "that thing they tried to perpetrate on you." As the district court explained in Washington, "[a] prosecutor must be careful not to characterize a defense as fabricated." 263 F. Supp. 2d at 434 (internal quotation marks and citation omitted). It is error for a trial counsel to disparage defense counsel by accusing him of "intentionally omitting unfavorable evidence in aid of spinning a 'yarn' more favorable to [the defendant]." Id. at

United States v. Fletcher, No. 04-0465/AF

436-37; see also United States v. White, 486 F.2d 204, 206 (2d Cir. 1973) (criticizing the prosecutor's repeated suggestions that the defense was "fabricated" as "unwise and unnecessary").

The trial counsel's disparaging remarks about defense counsel were less incendiary than her other comments and carried with them a greater likelihood of having been provoked. Yet when combined with the erroneous comments made about defense counsel's style, the trial counsel's other comments disparaging defense counsel constitute error that was plain and obvious. Trial counsel's attacks on defense counsel's courtroom manner and integrity were gratuitous and obviously intended to curry favor with the members. She drew direct comparisons between her style and that of defense counsel, painting herself as less "scary," more polite and more honest. The trial counsel's obvious attempts to win over the jury by putting herself in a favorable light while simultaneously making defense counsel look like a mean and nasty person who would say anything to get his client off the hook were plainly improper. The trial counsel erroneously encouraged the members to decide the case based on the personal qualities of counsel rather than the facts. Not only did her comments have the potential to mislead the members, but they also detracted from the dignity and solemn purpose of the court-martial proceedings.

### 3. Disparaging Comments About Fletcher's Credibility

Disparaging comments are also improper when they are directed to the defendant himself. For example, this court has said that calling the accused a liar is a "dangerous practice that should be avoided." United States v. Clifton, 15 M.J. 26, 30 n.5 (C.M.A. 1983). As the Second Circuit has explained, "Although we might expect a character in a Perry Mason melodrama to point to a defendant and brand him a liar, such conduct is inconsistent with the duty of the prosecutor to 'seek justice, not merely to convict.'" White, 486 F.2d at 206 (quoting ABA Code of Professional Responsibility, Final Draft, 1969, Ethical Consideration 7-13, at 79).

Here, the trial counsel told the members that Fletcher had "zero credibility" and that his testimony was "utterly unbelievable." In rebuttal the trial counsel also said, "[W]hen the Accused gets up on the stand and he lies who in fact was asking him the question? His own lawyer. Not me. And that was the first lie." Fletcher argues that these comments were plain error because they branded him a liar, unfairly disparaging and demeaning him in the eyes of the members. Fletcher argues that the trial counsel's comments were similar to those made in Knickerbocker, where this court held that the trial counsel acted inappropriately by offering his personal opinion that the

accused's testimony was a "fairy tale" that he found "insulting."  2 M.J. at 129.

The lower court found that "[t]hese comments were proper and relevant when viewed in the context of the trial as a whole."  We disagree.  We find that the trial counsel's comments crossed the "exceedingly fine line which distinguishes permissible advocacy from improper excess."  White, 486 F.2d at 207.  Fletcher's defense rested heavily on the claim that he was a good airman with an excellent reputation for truthfulness, and Fletcher provided testimony that could readily be viewed as incorrect or even as a lie.  He first testified that he had never used drugs, but later admitted that he had experimented with marijuana.  The trial counsel then properly impeached Fletcher on the stand.  Thus, the defense opened the door and it was appropriate for the trial counsel to comment on Fletcher's conflicting testimony during her findings argument.  It was improper, however, for the trial counsel to use the language that she did, language that was more of a personal attack on the defendant than a commentary on the evidence.

The question is whether this error rises to the level of plain error.  Although the trial counsel should have avoided characterizing Fletcher as a liar and confined her comments instead to the plausibility of his story, her comments were not so obviously improper as to merit relief in the absence of an

objection from counsel.  Accordingly, we find that the trial counsel's comments about Fletcher's credibility did not rise to the level of plain error.

    4.   Introduction of Facts Not in Evidence

    It has long been held that a court-martial must reach a decision based only on the facts in evidence.  United States v. Bouie, 9 C.M.A. 228, 233, 26 C.M.R. 8, 13 (1958).  It is also well established that arguments made by counsel are not evidence.  Clifton, 15 M.J. at 29.  "When counsel argues facts not in evidence, or when he discusses the facts of other cases, he violates both of these principles."  Id. at 29-30.

    There is, however, an exception to this general rule.  This court has held that it is proper for a trial counsel to comment during argument on "contemporary history or matters of common knowledge within the community."  United States v. Kropf, 39 M.J. 107, 108 (C.M.A. 1994).  In the past, "common knowledge" has included "knowledge about routine personnel actions," United States v. Stargell, 49 M.J. 92, 94 (C.A.A.F. 1998); knowledge of ongoing military actions overseas, United States v. Meeks, 41 M.J. 150, 158-59 (C.M.A. 1994); knowledge of the Navy's "zero tolerance" policy for drug offenses, Kropf, 39 M.J. at 108-09; the existence in the United States of a "war on drugs," United States v. Barrazamartinez, 58 M.J. 173, 175-76 (C.A.A.F. 2003); and any other matter "upon which men in general

17

have a common fund of experience and knowledge, through data notoriously accepted by all." United States v. Jones, 2 C.M.A. 80, 87, 6 C.M.R. 80, (1952) (quoting Wigmore, Evidence § 2570 3d ed.).

At the same time, counsel are prohibited from making arguments calculated to inflame the passions or prejudices of the jury. Barrazamartinez, 58 M.J. at 76. For example, in Clifton, the accused was charged with adultery. 15 M.J. at 27. During the findings argument, the trial counsel used an analogy to try to persuade the members that they could infer prejudice to good order and discipline. Id. at 28. The trial counsel argued that adultery is like heroin use, that both are charged as violations of Article 134, UCMJ, 10 U.S.C. § 834 (2000), and that in both cases prejudice to good order and discipline can be inferred. Id. On appeal, this court found that trial counsel's argument improperly drew a connection between the accused's actions and drug use in order to inflame the passions and prejudices of the court members. Id.

In this case Fletcher argues that it was plain error for the trial counsel to refer to Jesse Jackson, Jerry Falwell, Jim Bakker, Dennis Quaid, Matthew Perry and Robert Downey Jr. because there were no facts in evidence regarding any of these individuals and their names were used only for their sensational value. The Government maintains that such matters are within

the common knowledge of the community and that Fletcher opened the door by arguing that he could not be a drug user because he had a reputation for doing good work and regularly attending church.

We find that the trial counsel's references to religious figures and entertainers improperly invited comparison to other cases, the facts of which were not admitted into evidence and which bore no similarity to Fletcher's case. Although references to public figures and news stories may be allowed, the specificity and detail of her comments went well beyond the generic comments we have allowed in the past. See Barrazamartinez, 58 M.J. at 175-76; Kropf, 39 M.J. at 108-09. The trial counsel did not make generalized references to current events to give her argument some context. She made specific references to sensational events not in evidence in order to support her contention that Fletcher was guilty. Fletcher's good citizen defense may have opened the door to an appropriate response, but the comments of the trial counsel were "outside the bounds of fair comment." Barrazamartinez, 58 M.J. at 178 (Baker, J., dissenting).

Moreover, this error was plain and obvious. When the trial counsel asked the members to "ask Jesse Jackson about his two year old daughter," and to "[a]sk Jerry Falwell about the hooker that he got caught having intercourse with in a car in Palm

19

Springs," she was not drawing legitimate inferences based on the evidence nor was she referring to matters within the common knowledge of the members. She was instead inviting the members to accept new and inflammatory information as factual based solely on her authority as the trial counsel. These arguments were clearly improper and should have been prohibited or stricken by the military judge.

To summarize, we find error in trial counsel's open criticism and personal attack upon defense counsel. Because this error was properly preserved by objection, we will test for prejudice under Article 59(a). We also find error that is "plain and obvious" in trial counsel's arguments that vouched for evidence, injected unsolicited personal views of the evidence and Fletcher's guilt, suggested that the defense was a fabrication, and introduced facts not in evidence. Because there was no objection to these "plain and obvious" errors, we will test them under the plain error doctrine to determine whether they resulted in material prejudice to a substantial right of the accused.

## II. Prejudice

We have previously held that "it is not the number of legal norms violated but the impact of those violations on the trial which determines the appropriate remedy for prosecutorial misconduct." Meek, 44 M.J. at 6. In assessing prejudice, we

look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial.  Id. at 5.  The federal circuit courts use a variety of different tests to determine the impact of prosecutorial misconduct on a trial.  We believe the best approach involves a balancing of three factors:  (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.  In other words, prosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.

1.   Severity of the Misconduct

Indicators of severity include (1) the raw numbers -- the instances of misconduct as compared to the overall length of the argument, (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations, and (5) whether the trial counsel abided by any rulings from the military judge.  See Modica, 663 F.2d at 1181.

Here, the trial counsel's improper comments permeated her entire findings argument.  In twenty-one pages there are several

dozen examples of improper argument.  The improper comments do
not stand as isolated incidents of poor judgment in an otherwise
long and uneventful trial.  Fletcher's court-martial lasted less
than three days and the members deliberated for less than four
hours.  Accordingly, the trial counsel's misconduct was both
pervasive and severe.

    2.   Curative Measures

The military judge's curative efforts were minimal and
insufficient to overcome the severity of the trial counsel's
misconduct.  Before the findings argument began the military
judge gave a generic limiting instruction reminding the members
that "what the attorneys say is not evidence."  This instruction
was not a targeted, curative response as it was given before the
findings arguments rather than in response to a given statement
or at the end of the argument.  On a single occasion during the
findings argument, the military judge chastised the trial
counsel for her personal attacks on defense counsel.  This
single rebuke was not curative and was not enough to remedy the
trial counsel's severe and pervasive misconduct.  See Horn, 9
M.J. at 430.

The military judge did not make any effort to remedy any
misconduct other than the few statements to which defense
counsel objected.  As this court has recognized, "the judge
should have interrupted trial counsel before [s]he ran the full

22

course of [her] impermissible argument.  Corrective instructions at an early point might have dispelled the taint of the initial remarks."  Knickerbocker, 2 M.J. at 129.  On the facts of this case, "[i]t is impossible to say that the evil influence upon the [members] of these acts of misconduct was removed by such mild judicial action as was taken."  Berger, 295 U.S. at 85.

   3.   Weight of the Evidence

Fletcher argues that the court should view the strength of the Government's case absent any misconduct by the trial counsel with some skepticism.  Fletcher argues that there were no testifying eyewitnesses who saw him use cocaine, he never admitting to using cocaine, he readily consented to the second drug test after the first positive result, he had a long and distinguished military career, and there were numerous character witnesses who testified to both his reputation for truthfulness and his law-abiding character.  Although this court has upheld convictions in which a urinalysis test was the primary evidence, we have never said that a positive drug test automatically leads to a conviction.  In addition, Fletcher not only testified directly that he had not used cocaine, he presented circumstantial evidence concerning his religious and family life that could reasonably have raised questions in the members' minds about the strength of the prosecution's evidence.

When the three factors set out above are weighed against one another, the balance is firmly in Fletcher's favor. The trial counsel made multiple improper arguments. She violated the rules against vouching for witnesses, offering of personal views, attacking opposing counsel, and arguing based on scandalous facts not in evidence. In addition, her argument based on facts not in evidence was not extraneous commentary, but it was aimed directly at Fletcher's good citizen/good character defense. The trial counsel's "excess zeal [was] so egregious that it taint[ed] the conviction." White, 486 F.2d at 204. Her misconduct was not "slight or confined to a single instance, but . . . pronounced and persistent, with a probably cumulative effect upon the jury which cannot be regarded as inconsequential." Berger, 295 U.S. at 89. In this case, trial counsel's statements were so inflammatory and damaging that we cannot be confident that the members convicted Fletcher on the basis of the evidence alone.

Accordingly, we find that the errors here were materially prejudicial to Fletcher's substantial rights under both Article 59(a) and the plain error doctrine. In light of this prejudice, the findings and sentence must be reversed.

## DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings and sentence are set

aside, and the record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing is authorized.

**APPENDIX I**

**United States v. Fletcher**

**04-0465/AF**

**FINDINGS ARGUMENT BY THE GOVERNMENT**

CTC: Good morning.  As we told you in our opening statement of this case, the Accused had a secret and his urine told that the Accused used cocaine on diverse occasions in April of 2001. As we turn and look at the evidence in this case, it's going to be apparent that Prosecution Exhibits 1, 2, 3, 4, the bottles, they're all reliable.  They're all trustworthy.  They are all well done. He in fact went in, gave his urine and it was his urine that was sent to the lab and it was his urine that was tested at the lab.  So, we don't really have to worry about what happened, because of the triple locks, the ciphers.  The fact that the Accused's sample was collected according to the military standards, the exacting standards that we set for this.

Now, that brings us then to what happens at the lab, which is where we hear from Doctor Narish Jain, and that's Prosecution Exhibit number 6.  It's very apparent from talking to Doctor Jain that he is the best possible person in the whole country to come speak to us about this.  He's the father of GCMS for urine testing for drugs.   He was there at the beginning and he's there now.  And the defense would want to say that he's an old man.  Well, you saw him.  He's on the top of his game.  He's

26

never been better.  The defense would like to say, well, the machines are old.  Don't trust the man, don't trust the machines.  Neither the man nor the machines are old.  They are both on the top of their game and the Air Force is using the best ones possible.  The defense would like to say "Hey, Doctor Jain, he's not even from the lab."  Isn't that great though?  He's independent.  He's not there from Brooks Laboratory representing a lab that he doesn't want to turn in for not being good.  He's an independent person who is a civilian, who doesn't work for Brooks Laboratory, but is deeply and intimately involved in the setting up and the oversight.  He is utterly reliable.  So, Doctor Jain is the perfect person, who we are very fortunate to have heard from him in this matter.

Let me turn to Prosecution Exhibit number 7, which is the first test of the Accused's urine.  And this is a perfect litigation package. Prosecution Exhibit number 7, shows that 22, excuse me, 200 samples were tested.  Only the Accused showed up with cocaine in it.  Another sample was taken from the original bottle.  A whole different aliquot was poured and it was actually put into a whole different machine.  The testing was performed, and it again showed up BZE, just the same amount of benzoylecgonine.  Why is it that we're testing for benzoylecgonine?  Well, it's the smart and scientifically sound thing to do.  You'll recall that during the defense's opening,

27

he said that they don't even test for cocaine. Aren't you glad? If for example, cocaine were to be flying through the atmosphere, which we know it doesn't anymore than cyanide does and we're all still breathing, then fine, you know, we're not testing for cocaine. Why? Because the human body doesn't excrete cocaine. It puts out the metabolite for it. So we want to know if the man's body processed the cocaine, and yes, it did.

And you compared the immunoassay, which are the first two tests and their quantities versus the gas chromatography mass spectrometry, which will test only for BZE, and you can see that he had the processed metabolite of cocaine in his urine, not cocaine. Very, very reliable, and of course I've come to the last part of the first test which is the gas chromatography and mass spectrometry portion which quantifies his urine at 208 nanograms per milliliter, twice the cut off limit. The cut off limit, what does it mean? You can't pick it up from the atmosphere. You can't walk by a guy cracking smoke [sic]. You can't even dip your hands in cocoa paste even if you are a nail biter, even if you do have cuts in your hands, it won't go to a hundred, let alone 208. So, we know that that was from an amount that's consistent with recreational use, having fun and partying on drugs. And Doctor Jain has testified for us, that if the sample was given on a Monday, it is consistent with him

28

having used it over the weekend, Friday night, Saturday night. It is in fact, what we told you from the beginning, the urine tells on the Accused's use of cocaine.

Now, the defense would like you to think about log discrepancies. Okay, let's talk about lab discrepancies. And the lab discrepancies aren't scary. They're actually very comforting. They do in fact show us how incredibly good the lab is. They have a whole bunch of checks and balances and they work. And they showed us that they work. There are internal standards. There are quality controls. There is quality assurance. There is blind quality controls. And there are external quality controls, i.e., the samples sent in disguised as members' samples. And they all test out exactly right.

Now the defense has pointed to the lab discrepancy reports. Let's talk about those. And I would point you towards when we were talking about and going over actually and in my redirect, what lab discrepancy reports truly are. And if you look at Prosecution Exhibit number 8, on page 25, when the internal standard didn't have an exact high peak on a water blank, that's an internal standard discrepancy. It's great. It shows us that the machine is working. And even if it isn't exactly perfect, which Doctor Jain said it's forensically important, he wouldn't have done it over again. But the lab, hey, they're going to do

it over again.  How many times do things like that happen a month at the laboratory?  Well, we talked about it and we revealed the numbers.  About 12 in April and 18 or so in May of 2001.  And we know that they test 30,000 samples per month.  You do the math.  It's about .05 percent of discrepancies like that, internal standards, calibration off.  And we don't even go forward and test it if the calibration isn't perfect.  How would you know the calibration was perfect? It's in the reports for that machine, for that test for that day for his sample.  It's comforting.

Now, how do you know you've got everything to do with the Accused's sample?  Well, again, Prosecution Exhibit number 8, even when the printer didn't print out the first page cause there was some sort of a problem with the printer, you're going to have to suffer through looking at starting the printer over again.  And they include that.  Paperwork thrown away. Does it make any difference if we would have thrown away that paperwork?  Well, now it's included for you.  Even a reprint, just because the first page didn't come out.  It's unassailable.

Now, Greystone's report, and that's amusing, because when you actually heard it for the first time from the defense it sounded rather spook-tacular, but it's not.  What were the problems?  Okay, have you ever had an opportunity to have an

inspection in your unit?  Even if it's tip, tip top, the people who come through and inspect have got to find something, they've got to.  Why are they doing an inspection if they don't really look for something?  What do we have in the Greystone report?  Inconspicuously posted, set of people who are allowed in the room.  Well, we know that there 80 people who work at the lab.  Each people [sic] have to do a card swipe to get into each particular section.  And it only works by the hours.  So if they were to come back after close of business, they don't get to get in.  Conspicuously posted, and of course let's shine the true light of what that really means.  The elevator permit wasn't posted right by the door.  It was posted some other place.  Okay, the equivalent of sign in logs not completely filled out.  You ever had two people come to your unit, you put the names down, but they're both from the same location and they have the same phone number, so you draw a line and do dittos.  They don't accept that there.  So, you get written up.  A secondary alarm system, after the ones that we talked about, not responded to when it went off in the middle of the day.  Okay, and that's what they got for the whole report.  Excellent.

Picking on the lab employees for stuff like 1998 problems with chain of custody annotations with Mr. Colunga was cheap, it was cheap.  There's nothing wrong with the chain of custody on the Accused's sample.  And really there was nothing wrong back

31

in '98, but he wasn't too swift with the paperwork. That was a long time ago.

Tube swapping, it's a rather sexy term isn't it? It could get your attention at the beginning? Nonsense. We know that the Accused's tube can't be swapped because a scanner from the machine will pick it up. It's bar coded like the supermarket. And you can check everywhere yourselves. Tube swapping doesn't happen. But you know it isn't going to happen because it would say so when a water blank shows up glowing with cocaine and the Accused's shows up looking like water. Of course, it didn't happen. Sometimes when it's fed into a machine. But the internal standards and quality controls are in place. At the hospital here at the base, has anybody ever been late to work there? Has anybody ever gotten a letter of reprimand for financials or whatever or anybody ever dropped a tube there? Does that mean that you wouldn't go and get your teeth clean and trust that they're clean. This is a lot simpler. There is no human error once you feed it into the machine. These machines are properly calibrated every time. There's every possible control on them. Their error rates are miniscule. They've got water blanks, and the gas chromatography mass spectrometry are new machines, state of the art, and gas chromatography is the gold standard. We've got the best and the newest.

And the lab is starving for work. They're not overworked and rushing to get this done. They've done a magnificent job. Prosecution Exhibit number 8, same, same, except for we've got that water blank, a little bit of a flat peak, but starts over again on that run and that's of course what they do when an internal standard is off, they start over and do a new one. And of course, the printer page went out. That's not very impressive. The results are fabulous. And they're what we'd expect from that lab and their exacting forensic standards. Now, the Accused tested positive for cocaine metabolite in his sample.

And we don't know, we've never presented who it was that he was using with; how much he bought it for or how much he was using, or whether he was having a good time when he was getting high. We don't know. But the law does in fact allow you to infer that he was using it knowingly. That's the law, you can do that. And it makes sense if you think about it, because folks use drugs in private. They're not going to do it at the unit. He's not going to show up at the office and stick something up his nose or light up a crack pipe. He's not going to do it at the office or do it in public. Any potential witnesses for this are probably other drug users themselves and are arguably in hiding distancing themselves from him as he goes through this, whoever his dealer is. Why should you make this inference in

this case though, and that's where we're going to ask you to apply good old fashion common sense.

Taking a look, what alternates would the defense have you believe, well for goodness sake, that he ate hundreds and thousands of dollar bills and metabolized them all about an hour before he took his urine sample; right. At 8:30 -- at 9:30 a.m., in the morning, he spend the wee hours munching dollar bills, no. Cocaine in the air at Cape Canaveral, in his home, in his car. Well, we know that doesn't even work anyway. The pizza guy took his hard earned pizza delivery money and sprinkled it on his pizza? Fiction, fiction. How about that hand washing thing that they tried to perpetrate on you? Hand washing, it's not going to skew it to a positive result if somebody has spiked their hands. It's going to skew it for a negative result.

Now, we know that Mr. Varoz tells everyone, including the Accused, wash your hands with just water. The fact that the Accused may or may not have done that, does or doesn't remember, doesn't go in his favor if he chooses not to wash his hands and follow the rules before he gives his urine sample. Now, not to be crude, but you gentlemen have the advantage over us. You've got the opportunity and equipment to aim right in the bottle and not even go on your hands. Women, not such a good luxury. We

don't stand as good a chance.  Gender bias in favor of the Accused's sample.  Don't give him the benefit of that doubt.

Now, the argument of cocaine falling from the ceiling and going into the -- or from his clothes even, if he has cocaine on this clothes, going into the sample and then somehow 100 percent metabolizing for BZE is preposterous considering the fact that he isn't old enough to make the alkaline urine -- that the conditions were not such that a hot temperature to cook it, and it happened twice.  Did cocaine actually fall from the ceiling, from the Patrick bathroom as well as from our laboratory here, or excuse me, as well as from the bathroom up at the Cape, another fiction. That thing about well, you could have been exposed to a tiny amount and it just metabolized, or entered the urine and suddenly, you know, at the exact right time you give the urine in the cup to reach 202 and 136 [sic] two weeks in a row.  Hmm, no, not at all, it's ridiculous. You know what it is, it's as stupid as a teenager coming to you and saying dad, I got pregnant from a toilet seat at a gas station.  And then coming around to you later and then saying the same thing again.  If you're not convinced from the first urinalysis, how about by the second?  Do you need a third?  Do you need a fourth?  A dozen, do we pee him every two weeks and keep testing?  No.

Now, we've seen some nice people come in and testify on his behalf, and he's a good worker. And I'm not taking anything away from his family or his church or his duty performance. And the Accused is probably a nice person. But nice persons [sic] can use drugs. Church goers can use drugs. And people can be other than what they present themselves to be at work and on Sunday mornings. All the times that he was possible to do these things, unaccounted for.

You know, the guy knew since the 24th of April that he was hot for urinalysis. He's had the opportunity to reconstruct and when he testifies to you "I don't know." Where was he? Why'd you take leave? "I don't know." How reliable, how believable and credible is that. Are we to believe that he didn't check it out? We get 30 days of leave a year. We use them very judiciously, especially when we're coming around to retirement. We want to have a big blowout of time at the end where you get terminal leave. And you get paid. I don't know what I did with my leave. I don't think so.

Should we trust him? Well, let's look back on one of the most telling factors about who he really is. He sure did give a nice speech. It's almost seemed genuine, but he didn't know that I had on my desk under the paperwork, researched back to 1983, and discovered that he had used marijuana. He didn't know

I had that.  So when he stood up there and he sat down and he just looked you all right straight in the face with the most integrity appearance he could muster and said, "I have never used drugs and I never will."  You really want to go for it. Fiction, and I knew it. Why? Because it's in his paperwork, but he didn't know that I knew.  And he didn't know that I would tell him.

Now, I went a long time cross examining him, gave him the opportunity to have integrity or to make another fiction for you, all the way through at the very end of my cross examination, I asked him about why?  And his excuse showed that he had no integrity. He could have come forward and said, look it was a long time ago.  And I just didn't think you'd find out about it, and it really shouldn't matter because I was a teenager.  Ha -- he said I thought the defense counsel was asking me about the military only.  And if that were true, then his answer should have been, while in the military I have never used drugs.  And while in the military I never will. Nuh uh, that's not what he said. His impression wasn't impressive and a complete fiction. And it shows how he tricks all of these other nice people who came in to say he's a good guy.

Now, let's go back and reconstruct, what was the defense counsel's question.  The third time he asked it, I didn't even

object asked and answered, let's see what happened. Sergeant Fletcher between the 1st of April and the 24th of April did you knowingly use cocaine? That was the question. His answer, I did not. It was designed to build credibility with you all. Okay, but there are other indicators into his lack of credibility and it's not too bad to deal with just on it's own. How about the joke, I've never opened my personal emails, because right then I was working in the orderly room. Oh yeah, when have you been in the orderly room since? January, he's trying to pass it off that he doesn't check his emails since January. Nuh uh, is that actually possible? Well the witnesses, his friends say not. We all know that we're networked. You can check your email even if you're not on your own computer.

How about with all those extra taskings he was trying to impress you with, he doesn't check his email? Or how about, yeah, get this one, I don't know where I took leave to. There's another indicator. Do you know where you took leave to this year? Sure you do. Last year, probably. The year before, likely. Would you be darn good and certain where you took leave to if your urinalysis had come up positive? Absolutely. He's got zero integrity and he's telling us that he didn't knowingly use cocaine is utterly unbelievable.

Well, how about the idea of well, I got, he might have used the wife's prescriptions -- for arthritis meds? For back pain -- nah uh. We know what the process is if you do something like that. A guy has a medical issue, uses his wife's scrip, tests positive for something. Well, they don't give out prescriptions for cocaine. They got this laboratory -- or at this base here, but let's say that even if something like that had happened in the past, what's the process? They guy says okay, this is probably where I got it from, and we investigate and drop the charges, and admonish him for using somebody else's scrip. That's what you do. You don't take him to court. And it's funny that it just comes up here where the wife who loves him very much, would very much like to have his retirement. And she doesn't remember anything either. As Doctor Jain told us, only cocaine yields cocaine results. Not Solarcane or Lanacane or Novocain or Coca-Cola or anything to do with coffee or caffeine or anything other than coke.

Okay, does his religion hide him? Well, no, he had those beliefs since he was a child and he was also in Junior ROTC, in high school that didn't stop him from using drugs back in high school. Is a religion an indicator of law abidingness? Is it okay to play faith for a get out of jail free card -- nah uh. Do people even with true faith make criminal mistakes? Do they or they or criminal actions, do they use drugs? Yeah. Do they

39

commit adultery on their wives?  Ask Jessie Jackson about his
two year old daughter.  Ask Jerry Falwell about the hooker that
he got caught with having intercourse with in a car in Palm
Springs.  Jim Bakker cheating on his taxes.  I challenge you in
findings to come up with the rest.  I made a huge list but I
don't have time to go over them.

Is the fact that he's done good work mean that he can't use
cocaine, nah uh.  Dennis Quaid, prolific actor, needed inpatient
treatment.  Friends, Matthew Perry, fabulous performer, shows up
every week.  Had to go to inpatient treatment for drugs. How
about this one, Robert Downey, Jr., wins an Emmy for the
performances that he had during the time with which he was
actually being arrested, charged and showing up positive for
having used cocaine.  Sure, you can function, as Doctor Jain
said.  You can use it in the morning and you won't know by your
testimony in the afternoon if the man sitting next to you could
have used it last night and you wouldn't know today.  Besides
the Accused's samples are consistent with weekend use, not being
buzzed in the office.

We gave you various calendars, things to think over and as
far as whether or not he was in fact trying to avoid the
urinalysis, sure he was.  Sure he was.  And why wouldn't he?
He's got a cocaine problem and it's going to show up in his

40

urine.  Sure.  And that's where the defense exhibits A, B, C, D, E, whatever, A through D come in.  And I was glad that this hearsay was admitted, that you could take a look at it. Because it shows that as of the 22nd, Mr. Varoz had selected the Accused and he didn't test until the 9th. Some of it, I would ask you not to consider, okay.  March 30th, please don't hold that one against the Accused.  It appears strongly to be a unit sweep. And we don't think that he tried to avoid a unit sweep.  It wasn't his unit. So don't hold that one against him. But let's look at the 26th, and the 28th and the times that he took leave, not a bad idea.  And just go get yourself into class.  And you're home free.  He was awfully close in the science.  One more urination cycle and it would have been out of his system.

It was his time to get caught.  And it's now time to convict.  He clearly is a weekend cocaine user, on divers occasions.  There is no way that that second use of cocaine, or that second urinalysis could have come from the one that began or that was taken on the 9th of April.  He is in fact guilty of divers uses of cocaine.  The system has worked exactly as planned.  And we ask you to find him guilty as charged.

**REBUTTAL ARGUMENT BY THE GOVERNMENT**

CTC:  Well, we sure do have different styles.  And I think it actually is going to play for once in the case.  I will not shout at you.  I will reason with you.  I will present evidence and what's fair.  I ask you to consider that.  And in the overwhelming light of what you know now, the defense's shouting fails and here's why.  Yes, we do have to prove that he knowingly and consciously used drugs.  But you can infer that in the absence of evidence to the contrary.  What is he going to do about those two positive urinalyses?  Nothing.  Dad, I got pregnant from a toilet seat, twice.  No, way.  Now, whether or not he was selected and he read his email is almost academic.  Because it's so clear from the urinalyses that he was doing it over and over.  But the emails and whether or not he knows, is very clear, he was dodging the test.  And he was dodging it because he knew it was in his urine.  He dodged it on the 26th, dodged it on the 28th and took a class for the next week.  He was good to go.  Of course, he knew that that was his duty and of course he knew that his first sergeant wasn't going to be there that week.  Now the defense's attempt at persuading you by saying, "Hey, if he knew he was going to take a test, well then, he knew that he knew he had a bullet with his name on it.  And he wouldn't have done cocaine."  That's why it's illegal.  It's addictive.  And it's a strong addiction.  And it's something

42

that once you've gotten involved in it, you like it in your life and that's where Sergeant Fletcher was at the time. And he thinks he's a pretty smart fellow, Sergeant Fletcher does. He's gotten some real positive feedback in his life about how smart he is. So he thought he knew the test and he knew how to beat it. Except for he miscalculating it by one urination. Why did he consent? Well, he thought it was going to be negative. It's Tuesday, it should have been out by then, unless he was doing it on Saturday night or a big batch on Friday. Lab errors and mistakes, Doctor Jain, a cheerleader for Brooks. Hah, Ha, Ha. That's rich. Doctor Jain is involved in inspecting the lab. He's one the folks who look into it to see, and mark them down when their naughty. When they're doing the inspections for whether or not there's QCs or whether or not there's conspicuously posted who gets in and who gets out signs. Now the tracking numbers changing from 2 to 7, was it caught at the Brooks lab? I don't know. Do you care, no. If that's the best they can point to, it's a pretty super test. Doesn't shake anyone's confidence in sending their urine sample over. You know that the lab tests, and I'm showing you Prosecution Exhibit 5 for example, the lab doesn't test for the base's number of 228. The lab tests from their bar codes and their scanner. So what's on the bottle, other than the Accused's social, isn't what the lab goes by. It makes pretty good sense that they

wouldn't catch that.  If they didn't, they didn't.  The Basalt Study is just my favorite.  I have a package of Sweet'N Low here.  I'm going to dump it all out.  Now, we're talking about in the Basalt study, 1/20th of a package of Sweet'N Low, so let's see, oops I dropped some, a little tiny bit.  It's back on now.  Let's see what happens when we take a 20th from the package of Sweet'N Low --

CDC:  Your Honor, I'm going to object regarding this, how that she's going to divide this into 1/20th.

MJ:  Sustained.

CTC:  Well, member's, you've got Sweet'N Low.  You can think about it.  You can take 1/20th except for don't take 1/10th of it and line it out and see if it doesn't look just like Miami Vice.  Why would you take a 1/10th of it, because street purity is only about 50 percent.  It looks exactly like what a drug user would stick up his nose.  Under the Basalt Study it wasn't even about that.  The Basalt Study was about catching and orally ingested cocaine in urine, and how do we know that?  Because Doctor Jain and Doctor Basalt worked together.  And they are professional associates and well acquainted with all the procedures.  And that's on the test. No, you can't take that much orally even dissolved in a liquid and not feel it.

44

CDC:  Objection, Your Honor.  Facts not in evidence.

MJ:  Overruled.

CTC:  You get a numb mouth.  You get a racing heart.  You get increased alertness.  And that is what you get and that is what Doctor Jain testified to.  And that's just a little amount.  But certainly, if you do the test you'll see.  Are you scared of your pizza delivery guy now?  I don't think so.  Drug users like their drugs.  They're not going to be the cocaine fairy jumping around giving it away as an Easter gift.  Who's going to give away cocaine?  It's contraband.  It's hard to come by.  It's a very expensive item, and it's very dangerous to get it from the kind of people who sell it.  They don't give that away.  Plus, it's addictive, so you want to hang onto it.  Twice, the cocaine fairy visits him twice?  No way.  Now the part about the Accused lying is really funny because the defense attorney who is the one with the overpowering and yelling and cutting people off cross examinations and the wild argument that he just gave you --

MJ:  Five minutes.

CTC:  -- okay.  He's the one that could have scared a witness and freaked them out.  Me, I won't cut them off.  I'll apologize if I do.

45

CDC:  Objection, Your Honor, improper argument.

MJ:  Sustained.  Don't comment on the character of the defense attorney.

CTC:  I'm commenting -- yes, Your Honor, I'm commenting on myself though, sir.

MJ:  Just comply.

CTC:  Well, ask yourselves, do I scare you?  Am I going to --

CDC:  Again, objection, Your Honor.

MJ:  Overruled.

CTC:  Will I cause you to lie?

MJ:  Sustained.

CTC:  Now --

MJ:  Hold on a second.  I'm sustaining the objection. We're not trying the character of counsel.

CTC:  Yes, Your Honor.

MJ:  Talk about the evidence.

CTC:  Well, and then when the Accused gets up on the stand and he lies who in fact was asking him the question?  His own lawyer.  Not me.  And that was the first lie.  Well, bladder and kidney problems, that's another phony distraction.  Colonel

Torrent's stipulation of expected testimony shows that there was no way that any medications or bladder and kidney problems could possibly have caused a positive result.  Like Doctor Jain testified, cocaine tests for cocaine metabolites, nothing else.  And when you come down to the end of this case, there's just nothing that the defense can tell you, there's nothing that I can tell you that the evidence doesn't already show you.  If you take urine from the Accused on a Monday or a Tuesday, it's going to show up positive for cocaine.  And you need to find him guilty as charged.  And we ask you to do just that.  Thank you.

CRAWFORD, Judge (dissenting):

While I agree that trial counsel's argument was at times improper and unprofessional, there is nothing to indicate that any such error materially prejudiced Appellant's substantial rights. Thus, whether or not defense counsel's objections are preserved for appeal, I agree with the United States Air Force Court of Criminal Appeals (CCA) that "[v]iewed in the context of the case as a whole, including the strength of the government's evidence . . . the prosecution argument did not 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" United States v. Fletcher, No. ACM 34945, slip op. at 8 (A.F. Ct. Crim. App. Feb. 27, 2004). For this reason, I find that any improprieties by trial counsel in this case were harmless, and I therefore respectfully dissent.

### Objections by Defense Counsel

As noted, defense counsel remained silent during the Government's primary findings argument, and made only two objections relevant here during the Government's rebuttal. The military judge promptly sustained both objections, and admonished trial counsel not to remark further on defense counsel's character. There were no objections to the remaining three categories of alleged prosecutorial misconduct.

Significantly, this Court has previously noted that "'the lack of defense objection is relevant to a determination of

prejudice' because the lack of an objection 'is some measure of the minimal impact of a prosecutor's improper comment.'" United States v. Gilley, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting United States v. Carpenter, 51 M.J. 393, 397 (C.A.A.F. 1999)); see also United States v. Doctor, 7 C.M.A. 26, 135, 21 C.M.R. 252, 261 (1956) ("It is a little difficult for us to find misconduct which compels a reversal when it purportedly arises out of an argument which had so little impact on defense counsel that they sat silently by and failed to mention it . . . at the time of trial.").

Here, aside from the probable minimal impact of trial counsel's remarks, defense counsel had independent reasons to believe that any objections would be futile. Trial counsel's references to religious figures, for example, were "fair response" defense witness testimony concerning Appellant's affiliation with the Baptist church and his living a "Christian life." Gilley, 56 M.J. at 120. Other courts have found harmless error under a theory of "invited response" where the Government included religious statements in the closing argument. See, e.g., Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998) (biblical references by prosecution were invited by appellant's testimony concerning his salvation while in prison awaiting trial, and statement that Satan beguiled him into committing the murder); Fahy v. Horn, 2003 U.S. Dist. LEXIS

2

14742, at *152, 2003 WL 22017231, at *53 (E.D. Pa. 2003) (prosecutor's statement that defendant was the "representative of Satan who committed this act" was invited by defense counsel's remark that "[s]omeone, some representative of Lucifer or Satan went into that house and did this unconscionable deed.").

## Strength of the Government's Case

In finding plain error below, the majority assigns undue significance to the Government's findings argument, and not enough weight to the trial as a whole. Trial counsel's allegedly improper comments are limited to twenty-one pages of the transcript, among what the majority characterizes as "an otherwise long and uneventful trial." Whether or not eventful, the CCA concluded -- and I agree -- that the Government's case against Appellant was strong. Notwithstanding Appellant's efforts to attack the laboratory and the results of his two drug tests, the CCA found:

> [T]he uncontroverted testimony of [Dr. Jain] established that the urine testing was done properly, that any mistakes attributable to the laboratory were minimal and did not impugn the reliability of the results, and that the two tests were sufficiently far apart so as to reflect two separate and distinct ingestions of cocaine.

Fletcher, No. ACM 34945, slip op. at 7.

By contrast, Appellant's innocent ingestion theory was relatively weak. The members could very reasonably have

dismissed Appellant's suggestion that the cocaine he ingested was placed in his food by a drug-handling chef:  "[I]s it so preposterous that here in Cocoa Beach . . . a cook, a chef, a bartender, the delivery person using cocaine . . . could be using [it] on food preparation surfaces.  It could be in a bar and people wiping it clean and it falling into glasses. . . ." As the CCA noted, "appellant's own testimony provided no reason seriously to believe or even suspect that an unknowing ingestion had occurred."  Fletcher, No. ACM 34945, slip op. at 7.  We have previously considered the plausibility of an appellant's defense theory in determining prejudice from error.  See e.g., United States v. Walker, 42 M.J. 67, 74 (C.A.A.F. 1995) (finding "patently feeble" appellant's innocent ingestion theory based on "consumption of 'crumb cake' during a drinking party," testimony that "his lips were 'numb and tingly,' and the subsequent discovery that a drug dealer attended the party."); United States v. Brooks, 26 M.J. 28, 29 (C.M.A. 1988) (considering appellant's "weak" theory of the case and "implausible" suggestion that the Army investigator's confidential informant planted evidence on him in determining harmlessness). Appellant's failure to seriously challenge the Government's case against him is relevant to my determination that he suffered no material prejudice from trial counsel's comments.

## Limiting Instructions

In addition to the strong case against Appellant, the military judge took appropriate steps to limit any potential harm resulting from trial counsel's remarks. After the findings argument, the military judge instructed the members: "Remember, that the arguments of counsel are not evidence, but they may assist you in forming your view of the evidence. . . . It is your own independent recollection of the evidence that you must rely upon in deciding the facts in the case." Jurors generally, and perhaps our "blue ribbon" military panels particularly, are presumed to follow a military judge's instructions. Nothing demonstrates to me that the members in this case were unwilling to or incapable of understanding and complying with the instruction above.

## Plain Error

Finally, for the same reasons that Appellant cannot show material prejudice to his substantial rights under Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a) (2000), he cannot succeed on plain error.

> Before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

United States v. Fletcher, No. 04-0465/AF

United States v. Kho, 54 M.J. 63, 65 (C.A.A.F. 2000) (Crawford, C.J., concurring) (quoting Johnson v. United States, 520 U.S. 461, 466-67 (1997)) (citation omitted).  As I stated in Kho, I see no difference between an error that "materially prejudices . . . substantial rights" under Article 59(a), and an error that "affects substantial rights," as contemplated in Johnson.  Kho, 54 M.J. at 66.  Therefore, the facts of Appellant's case, applied to the above test, do not require this Court to take corrective action.  For these reasons, I respectfully dissent.