# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40129**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Ian J.B. CADAVONA**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 September 2022

———————————

*Military Judge*: James R. Dorman

*Sentence:* Sentence adjudged 25 March 2021 by GCM convened at Kadena Air Base, Japan. Sentence entered by military judge on 21 April 2021: Bad-conduct discharge, confinement for 7 months, and reduction to E-1.

*For Appellant:* Lieutenant Colonel Todd J. Fanniff, USAF; Major Stuart J. Anderson, USAF; Major Spencer R. Nelson, USAF.

*For Appellee*: Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge KEY and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial comprised of a military judge sitting alone convicted Appellant of one specification of indecent recording and one specification of indecent distribution of a recording, both in violation of Article 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920c; and one specification of obstruction of justice, in violation of Article 131b, UCMJ, 10 U.S.C. § 931b.[1] The court-martial sentenced Appellant to a bad-conduct discharge, confinement for seven months, and reduction to the grade of E-1.[2] The convening authority took no action on the sentence.

Appellant raises a single issue on appeal: whether trial counsel engaged in prosecutorial misconduct by making improper arguments during sentencing. Finding no error that has materially prejudiced the substantial rights of Appellant, we affirm the findings and sentence.[3]

## I. BACKGROUND

Appellant entered active duty service in December 2016 and was stationed at Kadena Air Base (AB), Japan, at the time of his offenses. The facts of this case begin between March and May of 2019, when Senior Airman (SrA) DT met GK, the victim in this case, and began a sexual relationship with her shortly thereafter.[4] On 2 August 2019, SrA SD held a birthday party at his

---

[1] Unless otherwise noted, references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.). Appellant was found not guilty of two specifications of sexual assault, in violation of Article 120, UCMJ, 10 U.S.C. § 920, and an additional specification of obstruction of justice.

[2] For his offense of indecent recording, Appellant received four months' confinement. For his offense of indecent distribution of a recording, Appellant received seven months' confinement. For his offense of obstruction of justice, Appellant received two months' confinement. Pursuant to the military judge's sentence, all of these periods of confinement were concurrent with each other.

[3] During its review of the record of trial, the court noticed, based on trial defense counsel's clemency submission, that clemency documents from Appellant might be missing. Accordingly, on 28 July 2022, this court ordered the Government to show good cause why the record of trial should not be remanded for completion and correction of the record. On 18 August 2022, the Government responded to the order, and concurrently filed a motion to attach an affidavit from trial defense counsel. In the affidavit, trial defense counsel stated she submitted a clemency request on behalf of her client, but that Appellant did not submit a separate memorandum for consideration by the convening authority. Appellant did not oppose the motion to attach. Having reviewed the record of trial and the Government's response on this issue, we consider this matter resolved.

[4] GK was an active duty service member at this time.

dorm; GK, SrA DT, and Appellant were among the attendees and each consumed a large amount of alcohol during the course of the night. Prior to 2 August 2019, GK had never met Appellant. SrA DT testified that he and Appellant were co-workers and that he did not have an extensive personal relationship with Appellant, in that they did not "really hang out much."

As the night wore on, the party shifted to SrA DT's dorm room. Eventually everyone left SrA DT's room except for SrA DT, GK, and Appellant. Earlier, Appellant had asked SrA DT if he could stay the night at his room because Appellant had been drinking; SrA DT had agreed. At some point, GK sat next to SrA DT and Appellant on the couch. During her testimony, GK testified she remembered "talking a little" with SrA DT, and "laying down on the couch so [her] head was in [SrA DT]'s lap." GK testified Appellant was at the end of the couch and she "guess[ed]" her legs were over Appellant. GK then pulled SrA DT's head down and kissed him. However, GK remembered Appellant kept trying to touch her vagina and that she kept "pushing his hands away." GK testified that she eventually got up and went to her dorm room across the hall with SrA DT, where they had consensual sex.

The next morning, SrA DT woke up and saw Appellant "looking at his phone, kind of stressed out, kind of like uneasy." SrA DT asked him what was wrong, and Appellant told SrA DT, "I think we f[**]ked up last night." SrA DT testified Appellant told him they had sent messages and videos on a Snapchat group chat called Alcoholics Anonymous, of which they were members, of their encounter with GK the night before; and that they had posted videos of Appellant "performing [oral] sex and digital penetration on [GK]," among other videos and pictures.[5] Appellant also told SrA DT that the night before when SrA DT was with GK, Appellant had answered a video call. Appellant and SrA DT decided to leave the group chat, and Appellant told SrA DT to delete anything he might have on his phone. GK was not a member of the group chat.[6]

That same morning, GK "started getting messages from different people, just saying that [they] needed to talk," including SrA CF, whom she did not know. GK also had a conversation with Appellant and SrA DT, during which SrA DT told her that Appellant "accidentally answered a FaceTime call and

---

[5] Snapchat is a social media application.

[6] SrA CF, a witness for the Government, described the Snapchat group chat as follows:

> So basically like for the groups, anybody can send pictures or messages. Usually, the pictures disappear the first time you look at them. You can replay them if you don't exit out of that specific chat. However, once you leave the chat, they're not re-playable. The messages usually they'll stay if it's a group chat, just depends on if you change the right setting.

that . . . [GK was] kind of exposed in it." GK did not really know what SrA DT meant by this. GK ultimately spoke with several Airmen about what happened. One of the Airmen, SrA AW, asked GK what she knew about the videos; when GK's response "didn't match up to" what had occurred, SrA AW then "told [GK] the actual truth and that there were videos from a group chat." GK testified she did not recall any details about a recording of any sexual acts, did not consent to any such recording, and did not consent to recordings being sent to the group chat.

By most accounts, the group chat contained 20 to 25 individuals who were active duty members, many of whom did not know or only vaguely knew GK. The Government called nine witnesses who were a part of the group chat that received the videos sent by Appellant. Almost every one of those witnesses testified they received either a video from Appellant of him digitally penetrating GK or a video sent from SrA DT of Appellant performing oral sex on GK.

During the Defense's case in chief, Special Agent TA testified that the Air Force Office of Special Investigations (AFOSI) obtained the cell phones of Appellant, SrA DT, and others—approximately 25 people in total. A number of those phones were sent to a forensic laboratory for review. No screenshots, pictures, or videos related to the events of 2 and 3 August 2019 were found. The search included the use of Cellebrite, a computer program that has the capacity to recover deleted files. AFOSI also subpoenaed Snapchat for information relating to the investigation, but received nothing related to the events of 2 to 3 August 2019. Special Agent TA testified he believed "there [wasn't] anything to be obtained."

## II. DISCUSSION

Appellant contends trial counsel's argument was improper because he made arguments that were not reasonable inferences from the facts, and that trial counsel argued alleged victim impact too attenuated to be attributed to Appellant. We are not persuaded by Appellant's arguments and find no relief is warranted.

### A. Additional Background

In presentencing, GK provided an unsworn victim impact statement to the court. GK told the military judge, *inter alia*, "What happened to me hurt when it happened and it still hurts today." GK described Appellant as "a stranger" and described what it was like "to wake up and hear from others how they had seen [her] exposed and vulnerable." GK "had to hear from them how this stranger took a video of [her] and sent it out and how they watched it." GK told

4

the military judge she would "never forget that feeling." GK also described being "distracted and worried" at work, and how hard it was to "cope with" Appellant's actions.

Trial counsel's sentencing argument focused in part on the "spread" of Appellant's actions. Trial counsel began his argument by stating that "all [GK] wanted to do was serve her country. . . . What she didn't ask for . . . was to be sitting in this court room [sic] as a victim. What she didn't ask for is to be recorded in her most vulnerable state." Trial counsel continued:

> [GK] didn't ask for a number of strangers to be looking at the areas of her body that she should control who should see or who shouldn't see. She didn't ask to be made fun of, she didn't ask to be humiliated, and she certainly didn't ask to be sitting in this court room [sic] embarrassed and ashamed and contemplating whether or not she wants to continue to serve with her brothers and sisters of the armed forces.

Shortly thereafter, trial counsel compared Appellant's crimes to a "virus" and "how that virus affects [GK] every single day for the rest of her life." Trial counsel stated once Appellant distributed the recording, he became "Patient Zero." Trial counsel argued:

> Your Honor, not just using your knowledge and ways of the world as it applies to Air Force members in PCSing,[7] but you know based on the various witnesses who testified and the various places where they're now PCS'd in the world -- that like a virus, [A]irmen spread across the world from PCS to PCS. And those 20 to 25 [A]irmen have already spread throughout Asia, carrying the knowledge of them viewing [GK]'s private areas when she didn't want them to. You know that this virus has spread to Europe, where these [A]irmen take that knowledge, take that memory with them of seeing [GK] in her most vulnerable states. And you know that it's also spread to various Air Forces bases in the United States. And just like the virus that we are all so familiar with today, this virus -- this video recording -- has been a global pandemic in the eyes of [GK] because there's no getting away from it, there's no vaccine for it, she just has to live with it every day, day to day, for the rest of her life.

Trial counsel further commented on behavioral changes experienced by GK as GK described in her statement, arguing this impact was "in direct relation also to the idea that this video recording has spread throughout the world."

---

[7] PCS is an abbreviation for "permanent change of station."

Trial counsel asserted, "There will never be another day where [GK] goes into a room in the Air Force somewhere -- whether it's a [dining facility], whether it's a new PCS station, whether it's her work place -- and wonders to herself, has anyone in this room saw [sic] me?" Trial counsel asked the military judge to sentence Appellant to two-and-a-half years of confinement and a dishonorable discharge, with the terms of confinement for each specification to run concurrently with each other.

Trial defense counsel did not object during trial counsel's sentencing argument. Appellant now argues that trial counsel erred by arguing that the videos would spread throughout the Air Force, when there was no evidence of such, and that Appellant was materially prejudiced by trial counsel's improper arguments. Appellant notes there was no evidence that the recordings were on anyone's phone, that there was no evidence that copies were made of the recordings, and that there were no "new people in the locations cited by trial counsel [who] will or could ever see these recordings." Appellant further states that even if trial counsel "intended to argue that GK would suffer the results of knowledge of the videos, rather than the videos themselves spreading," such argument would also be error—because, as Appellant claims, GK "did not express any concern about the fact that people who had seen [the videos] would, at some, point PCS, and no such concern can be reasonably inferred from her statement either."

The Government argues that "trial counsel never argued that any indecent recording of GK was retained and spread across the world. Instead, trial counsel argued that active duty servicemembers who had seen the video would carry that *knowledge* with them wherever they go after Kadena AB." (Emphasis added).

**B. Law**

The issue of "[i]mproper argument is a question of law that we review de novo." *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citation omitted). However, if the defense does not object to a sentencing argument by trial counsel, we review the issue for plain error. *Id.* (citing *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007)). To establish plain error, an appellant "must prove the existence of error, that the error was plain or obvious, and that the error resulted in material prejudice to a substantial right." *Id.* at 106 (citing *Erickson*, 65 M.J. at 223). Because "all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

"The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *United*

*States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). Three factors guide our determination of the prejudicial effect of improper argument: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction[s]." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005)). "In applying the *Fletcher* factors in the context of an allegedly improper sentencing argument, we consider whether trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the appellant was sentenced on the basis of the evidence alone." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (alteration, internal quotation marks, and citation omitted).

"Trial counsel is entitled to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Frey*, 73 M.J. at 248 (internal quotation marks and citation omitted). Additionally, "either party may comment on properly admitted unsworn victim statements" during presentencing argument. *United States v. Tyler*, 81 M.J. 108, 113 (C.A.A.F. 2021). "During sentencing argument, the trial counsel is at liberty to strike hard, but not foul, blows." *Halpin*, 71 M.J. at 479 (internal quotation marks and citation omitted). "[T]he argument by a trial counsel must be viewed within the context of the entire court-martial." *Baer*, 53 M.J. at 238. "The focus of our inquiry should not be on words in isolation, but on the argument as viewed in context." *Id.* (internal quotation marks and citations omitted).

We assume when analyzing allegations of improper sentencing argument in a judge-alone forum that a military judge "is able to distinguish between proper and improper sentencing arguments." *Erickson*, 65 M.J. at 225.

**C. Analysis**

Because there was no objection during trial counsel's argument, we analyze this issue under a plain error standard of review. After closely examining trial counsel's argument, we find Appellant has failed to establish error, let alone plain or obvious error, in those arguments. Many of the Airmen who received the videos had departed Kadena AB by the time of Appellant's trial. At the time of trial, one Airman was stationed at Aviano AB, Italy, another Airman was stationed at Keesler Air Force Base, Mississippi, and another Airman was stationed at F.E. Warren Air Force Base, Wyoming. It is clear to this court that trial counsel was articulating that those Airmen who watched the videos involving GK would take the knowledge and memory of what they viewed with them—not necessarily the actual videos—when they left Kadena AB.

It is accurate that GK did not specifically express any concern about the fact that people who had seen the videos would at some point have a PCS. However, GK stated, *inter alia*, that she had difficulty coping with Appellant's

crimes; that they "affected how [she] view[ed] [her] future in the Air Force;" that "others . . . had seen [her] exposed and vulnerable;" that she felt "isolated and alone;" and that she would have to live with Appellant's actions for the rest of her life. As our military society is a transitory one, with most service-members incurring multiple permanent and temporary duty assignments in a career, trial counsel's argument was not inaccurate; the points he was articulating were based on the evidence and reasonable inferences. Assuming GK were to stay in the Air Force, she would always run into the possibility that someone would recognize her from the videos Appellant and SrA DT made and distributed. Compounding this matter, GK did not have a clear picture of who all had seen the videos since she was not a part of the group chat and did not know everyone in the group chat. In other words, reasonable inferences could be made from GK's statements that she would always be exposed and vulnerable to a continuing impact of Appellant's crimes, no matter where she went. We therefore conclude Appellant has not demonstrated any error in trial counsel's argument, let alone plain or obvious error.

However, even if we were to assume that Appellant could demonstrate plain or obvious error, he has failed to demonstrate any material prejudice or that the error substantially influenced his adjudged sentence. *See United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018). The first *Fletcher* factor considers the severity of the misconduct. 62 M.J. at 184. On this matter, we note that the "lack of a defense objection is some measure of the minimal impact of a prosecutor's improper comment." *See United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (internal quotation marks and citation omitted). We would find that the comments were minor and relatively insignificant.

Regarding the second *Fletcher* factor as to the curative measures taken, no curative instruction was necessary because it was a judge-alone forum, and military judges are presumed to know and follow the law, absent clear evidence to the contrary. *See United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997) (citation omitted). Additionally, Appellant has presented no evidence that the military judge in this case was unable to distinguish between proper and improper sentencing argument. As to the third *Fletcher* factor, the weight of the evidence supporting the sentence, we find this factor weighs in the Government's favor. The evidence in this case was strong and virtually uncontested, coming from numerous witnesses about what they received and viewed. We find the facts and circumstances provide substantial justification to support the sentence, irrespective of trial counsel's unconventional and eccentric argument. We conclude that the weight of the evidence supports the adjudged sentence.

In conclusion, we find that Appellant has failed to meet his burden to demonstrate plain error, and after considering trial counsel's comments as a

whole, we are confident that Appellant was sentenced based on the evidence alone. *See Halpin*, 71 M.J. at 480.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court